895 F.2d 745
 31 ERC 1100, 58 USLW 2508, 20 Envtl.
L. Rep. 20,706,
36 Cont.Cas.Fed. (CCH) 75,810
 ATLAS CORPORATION, Kerr-McGee Chemical Corporation, Quivira
Mining Company, Western Nuclear, Inc., Atlantic Richfield
Company, Umetco Minerals Corporation and Union Carbide
Corporation, Homestake Mining Company of California, Inc.,
and Pathfinder Mines Corporation, Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 Nos. 89-1205 to 89-1212.
 United States Court of Appeals,
Federal Circuit.
 Feb. 2, 1990.
 
 Peter J. Nickles, Covington & Burling, Washington, D.C., Harley W. Shaver, Shaver & Licht, Denver, Colo. and Ramsay D. Potts, P.C., Shaw, Pittman, Potts & Trowbridge, Washington, D.C., argued, for plaintiffs-appellants. Also on the brief were Theodore Voorhees, Jr., Elliott Schulder, Jay T. Smith, Covington & Burling and R. Kenley Webster, P.C. and Jonathan S. Baker, Shaw, Pittman, Potts & Trowbridge, Washington, D.C.
 Peter D. Dickson, Van Ness, Feldman, Sutcliffe & Curtis, Washington, D.C., represented Umetco Minerals.
 Jon J. Indall, Carpenter, Crout & Olmsted, Santa Fe, N.M., represented Homestake Mining Co. of Cal., Inc.
 Sunny J. Nixon, Carpenter, Crout & Olmsted, Santa Fe, N.M., represented Pathfinder Mines Corp.
 Mary Mitchelson, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With her on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Leonard Kreitzberg, Dept. of Energy and Charles Mullins, Nuclear Regulatory Com'n Washington, D.C., of counsel.
 Before MARKEY, Chief Judge, BENNETT, Senior Circuit Judge,* and NEWMAN, Circuit Judge.
 BENNETT, Senior Circuit Judge.
 This appeal is from the final judgment of the Claims Court (Merow, J.) granting the government's motion for judgment on the pleadings and dismissing the complaints. 15 Cl.Ct. 681 (1988). We affirm.
 
 BACKGROUND
 
 1
 The plaintiffs are corporations, or successors to corporations, which entered into contracts with the government for the production of uranium or thorium.
 
 
 2
 Following the Second World War, uranium production in the United States was practically nonexistent, and the military was dependent on foreign sources. In the late 1940's, the Atomic Energy Commission (AEC) began a major program to encourage the domestic production of uranium and alternative sources of atomic energy, such as thorium. The AEC encouraged private companies to enter the uranium milling industry by contracting with them for the production of uranium. The contracts contained pricing provisions designed so that the private companies could recover their costs, plus a reasonable profit. In addition, the government funded substantial research and development efforts to improve uranium milling technology, and it provided substantial technical services to the industry. The Atomic Energy Acts of 1946 and 1954 each provided that the federal government could be the sole owner of uranium products. Through statutes and regulations, licensing, administrative oversight, and its contracts, the federal government maintained pervasive control over all aspects of uranium and thorium procurement, production, sales and disposal, starting in the late 1940's and continuing through the 1950's.
 
 
 3
 The plaintiffs were awarded uranium production contracts by the AEC or have acquired or merged with the original contractor and have succeeded to the interests and obligations of the original contractor. Plaintiff Kerr-McGee is the successor in interest to thorium production contracts. For the purposes of this litigation, the parties have not alleged any significant differences between uranium and thorium production. The contracts between the government and the plaintiffs were amended several times and spanned the period from 1950 to 1970. Beginning in 1964, the uranium producers were permitted to sell their products to private parties without government permission.
 
 
 4
 Uranium and thorium milling operations produce a sand-like residue called "tailings." Typical domestic uranium ore usually contains only about two to eight pounds of uranium per ton of ore, so the residual tailings may be quite extensive. The tailings are ordinarily stored in large tailings piles, usually located on the land adjacent to the mills. Tailings from the production of uranium pursuant to the contracts with the government have been commingled with the tailings from the production of uranium for private parties.
 
 
 5
 While nearly all of the uranium is extracted from the ore, the tailings continue to emit residual low-level radiation, primarily in the form of radon gas. According to the appellants, this fact was known to the parties to the contracts, but its significance was not fully understood at the time of the contracts. It was not until the late 1970's that the long-term potential health hazards associated with mill tailings and the radon emissions were widely recognized. To alleviate those hazards, costly measures are required to stabilize existing tailings piles. Such measures include seepage control, regarding the piles and covering them with clay and soil, and revegetating the piles or covering them with crushed rock.
 
 
 6
 Because of the potential health hazards associated with uranium mill tailings, Congress enacted the Uranium Mill Tailings Radiation Control Act (UMTRCA), Pub.L. No. 95-604, 92 Stat. 3021 (Nov. 8, 1978), codified at 42 U.S.C. Secs. 2022, 2113, 2114, 7901-7942 (1982). Title I of the Act provides that the federal government has responsibility for the stabilization and decommissioning of all inactive mill sites which were not licensed on January 1, 1978. 42 U.S.C. Secs. 7912-7919. Title II of the Act authorizes the Environmental Protection Agency to develop regulations for the stabilization and decommissioning of mill sites which remained active after January 1, 1978. 42 U.S.C. Secs. 2022, 2113. Under title II of the UMTRCA, the licensees are responsible for complying with the federal regulations concerning stabilization of the mill tailings piles, decontamination and decommissioning of the mill plants, and reclamation of the plant site. 42 U.S.C. Sec. 2113. The EPA and the Nuclear Regulatory Commission have issued regulations governing the stabilization of the licensed mill sites. 40 C.F.R. pt. 192 (1988); 10 C.F.R. pts. 40, 150 (1989). In addition, some states have enacted laws directed to the hazards of radon gas.
 
 
 7
 The plaintiffs held licenses on January 1, 1978, for active facilities. As a result of the UMTRCA and the regulations issued pursuant to that Act, and also possibly as a result of the plaintiffs' recognition of general obligations to conduct their business in a manner that does not expose the public to harm, the plaintiffs have undertaken costly measures to stabilize the tailings piles and to decontaminate and reclaim the uranium and thorium mill sites. In their complaints, the plaintiffs sought recovery of the costs associated with stabilization of the mill tailings that were generated from the uranium and thorium production under the completed contracts with the government.
 
 
 8
 The plaintiffs based their complaints on various theories. All of the plaintiffs sought reformation of the contracts due to mutual mistake. All of the plaintiffs other than Atlas alleged breach of express contract. Western Nuclear, Homestake, and Pathfinder alleged breach of an implied-in-fact contract. Western Nuclear included allegations of agency and that the UMTRCA is a compensable Fifth Amendment taking, violates the equal protection clause, and is an ex post facto law.
 
 
 9
 The government moved, pursuant to RUSCC 12(c) and 12(h), for judgment on the pleadings arguing that the plaintiffs had failed to state a claim for relief. The Claims Court granted the government's motion and dismissed the complaints, except for Western Nuclear's equal protection and ex post facto claims, which it transferred to the United States District Court in Colorado. All of the plaintiffs filed appeals. On appeal, Western Nuclear abandoned its agency claim.
 
 ISSUE
 
 10
 The issue in this appeal is whether the Claims Court erred in granting judgment on the pleadings and in dismissing the plaintiffs' reformation, breach of express contract, breach of implied-in-fact contract, and taking claims.
 
 OPINION
 
 11
 We review Claims Court decisions for errors of law and clearly erroneous findings of fact. Cooper v. United States, 827 F.2d 762, 763 (Fed.Cir.1987); Milmark Services, Inc. v. United States, 731 F.2d 855, 857 (Fed.Cir.1984). Because this case was before the Claims Court on the government's motion for judgment on the pleadings, each of the well-pled allegations in the complaints is assumed to be correct, and the court must indulge all reasonable inferences in favor of the plaintiffs. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); Owen v. United States, 851 F.2d 1404, 1407 (Fed.Cir.1988).
 
 I. The Contract Claims
 
 12
 The Claims Court held that the plaintiffs could not establish reformation or breach claims on the facts pled. The court referred to its limited contractual jurisdiction and stated that jurisdiction is conferred only where the government has agreed to be bound. It observed that it had no authority to write contracts, or contract clauses, for the United States by means of reformation where there has been no agreement, citing American President Lines, Ltd. v. United States, 821 F.2d 1571, 1582 (Fed.Cir.1987).
 
 
 13
 The Claims Court stated that it is undisputed that there was no agreement between the parties with respect to the now required tailings stabilization. Because the existence of the tailings hazard was not knowable at the time of the contract negotiations, there was no mutual mistake and no agreement between the parties that could be placed into effect through reformation. The court observed that only those costs that were knowable and subject to actual negotiation formed the basis for the fixed prices that the AEC agreed to pay.
 
 
 14
 The Claims Court also dismissed the plaintiffs' breach claims, holding that because no agreement on the tailings stabilization was or could have been negotiated, the plaintiffs have no breach claims to assert. The court dismissed Western Nuclear's implied-in-fact contract claim, stating that an implied-in-fact contract theory is not a viable claim in the absence of an agreement that would support reformation. Moreover, the court held that Western Nuclear could not show there was an implied-in-fact tailings hazard contract unrelated to the negotiated uranium purchase agreements.
 
 A. Reformation
 
 15
 The plaintiffs all seek recovery of the costs of tailings disposal on the theory of contract reformation. According to the plaintiffs, the parties to the uranium and thorium contracts made a mutual mistake concerning the necessary tailings disposal, and that mutual mistake requires equitable reformation of the contracts to provide that the government will pay for tailings stabilization. In the Joint Appellants' Brief, the plaintiffs describe the mistake: "[T]he parties were mutually mistaken concerning whether the tailings piles posed potential long-term health hazards and thus whether extensive and costly mill stabilization and plant decommissioning measures were necessary to eliminate those potential hazards." Joint Br. at 23.
 
 
 16
 We hold that the plaintiffs' allegations are insufficient because they have failed to allege a mistake that can support reformation.
 
 
 17
 A party seeking to state a claim for reformation of a contract under the doctrine of mutual mistake must allege four elements:
 
 
 18
 (1) the parties to the contract were mistaken in their belief regarding a fact;
 
 
 19
 (2) that mistaken belief constituted a basic assumption underlying the contract;
 
 
 20
 (3) the mistake had a material effect on the bargain; and
 
 
 21
 (4) the contract did not put the risk of the mistake on the party seeking reformation.
 
 
 22
 See Restatement (Second) of Contracts Secs. 151-152, 155 (1981); National Presto Indus., Inc. v. United States, 338 F.2d 99, 107-09, 167 Ct.Cl. 749 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965).
 
 
 23
 A "mistake" that can support reformation is a belief that is not in accord with the facts. Restatement (Second) of Contracts Sec. 151. To satisfy this element of a reformation claim, a plaintiff must allege that he held an erroneous belief as to an existing fact. If the existence of a fact is not known to the contracting parties, they cannot have a belief concerning that fact; therefore, there can be no "mistake."
 
 
 24
 Reformation serves to bring the parties' written contract in accord with their agreement. Professor Corbin states:
 
 
 25
 Reformation is not a proper remedy for the enforcement of terms to which the defendant never assented; it is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed. These antecedent expressions of agreement may have been such as to constitute a valid informal contract, in which case reformation is merely a step in the enforcement of that contract. The written document was intended to be no more than the integration in writing of the terms already agreed upon. In so far as it differs from those terms it is mistaken and will be corrected.
 
 
 26
 3 Corbin on Contracts Sec. 614 at 723 (1960). He emphasizes that "a court will not decree reformation unless it has convincing evidence that the parties expressed agreement and an intention to be bound in accordance with the terms that the court is asked to establish and enforce." Id. at 725.
 
 
 27
 In American President Lines, 821 F.2d 1571, we stated, "The purpose and function of the reformation of a contract is to make it reflect the true agreement of the parties on which there was a meeting of the minds." Id. at 1582. In the absence of mistake, fraud, accident, or illegality, a court cannot change the terms of a contract. Id.
 
 
 28
 This court cannot reach the equities of the reformation question. It is clear that reformation can be ordered only where there is an agreement to be given effect. The circumstances alleged by the plaintiffs are such that there could have been no agreement regarding the tailings costs because the existence of the tailings hazard was not recognized by the parties. The parties could not have formed a mutually mistaken belief concerning a fact whose existence they could not recognize. Therefore, there has been no mistake that can support reformation.
 
 
 29
 In the cases where courts have reformed a contract, the parties recognize the existence of a fact about which they could negotiate, they mutually form a belief concerning that fact, but their belief is erroneous. In those cases, the court may reform the contract to bring the parties' agreement in accord with the true state of the facts.
 
 
 30
 For example, in National Presto, 338 F.2d 99, the Court of Claims granted reformation of a contract to permit reimbursement for the cost of an additional step in a process of manufacturing artillery shells. Before the parties entered into the contract, they discussed whether an additional step was needed in which excess metal was shaved from the shells. Their contract did not include provision for the equipment for this additional step, but during the performance of the contract, it was determined that the additional step was in fact necessary. The plaintiff was required to obtain additional equipment. The court permitted reformation of the contract. Although the parties did not know of the need for the additional equipment, id. at 107, they clearly recognized that the equipment might be needed. They recognized the existence of a fact on which they could reach an agreement, and they formed an erroneous belief concerning that fact. Therefore, there was a mutual mistake, and reformation could bring their agreement in accord with the true state of the facts.
 
 
 31
 Similarly, in R.M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953), the plaintiff agreed to sell DDT in metal containers to the government under a contract which required the chemical to be a clear, stable liquid. When the DDT subsequently turned cloudy, the government refused payment. The Claims Court denied the government's motion to dismiss, stating that when the parties entered into the contract, neither knew that it was impossible to store DDT in metal containers without a resulting loss of clear color. The clear color requirement was part of the government's specifications, and the parties considered that fact when contracting. Their erroneous belief concerning that fact was their mistake.
 
 
 32
 Other cases in which courts have permitted reformation of contracts similarly show that the parties held an erroneous belief concerning a fact whose existence the parties recognized and about which they could reach agreement. See, e.g., Southwest Welding & Mfg. Co. v. United States, 373 F.2d 982, 179 Ct.Cl. 39 (1967) (the parties mistakenly believed the price of steel was lower than it actually was); Walsh v. United States, 102 F.Supp. 589, 121 Ct.Cl. 546 (1952) (the parties erroneously believed the minimum wage rate was a certain amount, even though it had increased earlier); Aluminum Co. of America v. Essex Group, Inc., 499 F.Supp. 53 (W.D.Pa.1980) (the parties erroneously believed that the Wholesale Price Index would accurately represent nonlabor production costs for the purpose of a contractual escalation clause). See also Bowen-McLaughlin-York Co. v. United States, 813 F.2d 1221 (Fed.Cir.1987) (reformation permitted where the parties erroneously omitted certain price items that were in existence and could have been included in the contract). Macke Co. v. United States, 467 F.2d 1323, 199 Ct.Cl. 552 (1972), does not show a different rule. The opinion in that case does not indicate whether a "mistake" was made by the parties. Rather, the court "interpreted" or "reformed" the contract to conform to the parties' practical construction. Id. at 1328.
 
 
 33
 Appellants argue that the Claims Court's distinction between "knowable" and "unknowable" facts has no bearing on whether a plaintiff has properly stated a claim for relief by reformation. The appellants cite Aluminum Co. of America in which the district court observed "[t]he law of mistake has not distinguished between facts which are unknown but presently knowable, and facts which presently exist but are unknowable. Relief has been granted for mistakes of both kinds." 499 F.Supp. at 64 (citations omitted). It is true that even though the outcome of a fact is unknowable, the parties can make a mistake concerning that fact. But where the existence of a fact is unknowable, the parties cannot have a belief concerning that fact, and they cannot make a mistake about it. Thus, in the famous case Sherwood v. Walker, 66 Mich. 568, 33 N.W. 919 (1887), the contract for the sale of a cow was held to be voidable where the cow was assumed to be barren but later was discovered to be pregnant. The existence of the fact as to whether the cow was barren or fertile was known to the parties even if the outcome of that fact was unknown.
 
 
 34
 In this case, the plaintiffs' allegations of their "mistake" do not show that they held an erroneous belief concerning a fact whose existence the parties could recognize and about which they could negotiate agreement. The statements the plaintiffs make in their complaints and briefs demonstrate that the parties could not have contemplated the potential tailings hazard when they entered into the contracts. Therefore, they could not have reached an agreement on the now-required tailings stabilization, and they could not have held a mutually mistaken belief concerning the abatement of the tailings hazard.
 
 
 35
 The plaintiffs state, "Thus, as alleged in the complaints, when appellants' contracts were negotiated and performed the parties did not fully appreciate the extent and consequences of the potential health hazards posed by the uranium and thorium mill tailings, or that such hazards could not be abated absent extensive and costly remedial measures." Joint Br. at 12. They state, "It was not until the late 1970's that the long-term potential health hazards associated with mill tailings became widely recognized." Joint Br. at 13.
 
 
 36
 Atlas states in its supplemental brief, "The full record put before the Claims Court by Atlas underscores the critical fact that neither the Government nor Atlas appreciated the extent or consequences of the potential health hazard posed by this radiation." Atlas Br. at 5. Quivira's complaint states, "These costs were not and could not have been anticipated at the time the Contract was entered into...." Quivira Complaint p 29. Western Nuclear alleged that "[w]hen the original Contracts and modifications thereto were entered into between Western and the Government acting through the AEC, the then existing technology did not recognize any reason to perform any Reclamation or Decommissioning on mill tailings or mills." Western Nuclear Complaint p 29. Atlantic Richfield stated that "neither party considered radiation levels in the produced wastes to represent a potential hazard or matter of concern" (Atlantic Richfield Complaint p 14) and that "[the reclamation] costs were not and could not have been anticipated at the time the 1951 or the 1959 Contracts were entered into...." Atlantic Richfield Complaint p 40. Umetco alleged that "the parties to those Contracts did not contemplate that any extraordinary efforts to stabilize or manage the tailings would be necessary." Umetco Complaint p 27. They also allege that "the state of scientific knowledge at the times the Union Carbide Contracts were entered into and performed had not permitted adequate understanding of the effects of uranium mill tailings." Umetco Complaint p 30. Homestake, also, alleged that "[the reclamation] costs were not and could not have been anticipated at the time the Contracts which are the subject of this Complaint, or any of the modifications or amendments thereto, were executed." Homestake Complaint p 27. Pathfinder stated that "[the reclamation] costs were not and could not have been anticipated at the time the Contracts were executed." Pathfinder Complaint p 20.
 
 
 37
 The plaintiffs' own statements and allegations demonstrate that the hazard associated with tailings was not, and indeed could not have been, within the contemplation of the parties when they entered into the contracts. Their statements clearly show the correctness of the Claims Court's ruling that the existence of the hazard was not knowable at the time of the negotiations. The Claims Court correctly stated that because it was not possible for the hazard to have been known to the parties, no agreement could have been reached on this matter which can now be put into effect through reformation. If the existence of the hazard was beyond the contemplation of the parties, they could form no belief concerning that fact. There can be no "mutual mistake" to support reformation here.
 
 B. Breach of Express Contract
 
 38
 All of the plaintiffs other than Atlas asserted breach of express contract claims. In their complaints, they allege that the government has breached the uranium and thorium contracts by not paying for the cost of tailings stabilization and mill decommissioning. The parties alleged that the contracts were designed to reimburse the milling companies for all reasonable costs associated with the production of uranium and thorium concentrate. Also, the parties alleged that tailings disposal was a reasonable cost, as shown by certain contract provisions allowing reimbursement for tailings disposal. The latter allegation is based on the "stretch-out" agreements between the government and the parties under which the uranium deliveries were "stretched out" past the contract termination date to account for decreased demand for the concentrate. As the plaintiffs have alleged in their complaints, the price of the concentrate for the "stretch-out" period was to be determined based on past costs incurred by the producer, including the past costs of tailings disposal.
 
 
 39
 The Claims Court did not err in granting judgment on the pleadings dismissing the plaintiffs' breach of express contract claims. The plaintiffs have failed to allege any contract provision that the government breached in not paying the costs of tailings stabilization. The complaints admit that the contracts were fixed price contracts, although the price was determined by obtaining or forecasting the producer's costs for the contract period plus a reasonable profit. Quivira Complaint pp 8, 12; Western Nuclear Complaint pp 14, 21; Atlantic Richfield Complaint pp 11, 15; Umetco Complaint pp 18, 21; Homestake Complaint pp 8, 12; Pathfinder Complaint pp 8, 11. The plaintiffs have not alleged that the government has not paid the prices agreed to in the contracts.
 
 
 40
 More importantly, the plaintiffs alleging a breach of contract admitted in their complaints that the contracts contained no provision concerning tailings stabilization costs. Kerr-McGee Complaint pp 24, 25; Quivira Complaint p 13; Western Nuclear Complaint p 21; Atlantic Richfield Complaint p 16; Umetco Complaint p 27. See also Homestake Complaint pp 27, 35; Pathfinder Complaint pp 20, 28.
 
 
 41
 The plaintiffs rely on Alvin, Ltd. v. United States Postal Service, 816 F.2d 1562 (Fed.Cir.1987), and argue that the absence of contract clauses specifically referring to tailings stabilization costs does not justify dismissal of their breach claims. Their reliance is misplaced. In Alvin, the court construed a contract provision regarding the payment of general real estate taxes. The Alvin plaintiffs relied on that specific contract term to argue that the Postal Service was required to pay "special assessments" that replaced the general real estate taxes. While that form of tax may have been unforeseen at the time the Alvin plaintiffs entered into the contracts with the government, the contracts included a specific provision that could be construed to cover the new taxes. In the present case, the plaintiffs have pointed to no provision that can be construed to require payment of stabilization costs.
 
 
 42
 The plaintiffs' arguments that certain contract provisions did require reimbursement of tailings costs and the costs of restoration and clean-up of sites and facilities are unpersuasive. As discussed above, that reimbursement provision was in the "stretch-out" agreements, in which the price of uranium concentrate for 1969-70 deliveries was to be determined based on costs incurred between 1963 and 1968. The plaintiffs have not alleged that the government has failed to pay the price agreed to in the stretch-out agreements based on the prior costs. They have admitted that the stretch-out agreements did not anticipate the stabilization or reclamation costs incurred after 1968, or specify which party would be responsible for those costs. Quivira Complaint p 17; Atlantic Richfield Complaint pp 26, 27. See also Homestake Complaint pp 17, 18, 27; Pathfinder Complaint pp 13, 20.
 
 
 43
 Finally, the plaintiffs argue that they are entitled to pursue alternative theories of recovery. They assert that it is improper to deem allegations that a contract does not specifically address tailings stabilization costs as equivalent to a concession that there is no basis for a breach claim. While plaintiffs can plead alternative bases of recovery, they must still plead sufficiently to support their claims. In this case, the plaintiffs have pointed to no specific provision that was breached. Therefore, it is not improper to look to the plaintiffs' admissions of what the contracts do not contain.
 
 
 44
 Western Nuclear's breach of contract claim is based on another theory. According to Western Nuclear, the government unilaterally modified the uranium contracts with the passage of the UMTRCA and the adoption of regulations requiring tailings stabilization. The contract allegedly provided for an "equitable adjustment" in the price after such unilateral modification by the government. The alleged provision is not in evidence. However, if it was the standard clause, it provided adjustment for changes by the contracting officer not relevant of course to these changes by Act of Congress. In any event Western Nuclear's breach claim on this theory is barred by the Sovereign Acts Doctrine. Under that doctrine, the government is not contractually liable for acts taken in its sovereign capacity for the public good. As the Supreme Court explained in Horowitz v. United States, 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925) (quoting Jones v. United States, 1 Ct.Cl. 383, 384 (1865)):
 
 
 45
 The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons....
 
 
 46
 (Emphasis added.) See also Tony Downs Foods Co. v. United States, 530 F.2d 367, 370-71, 209 Ct.Cl. 31 (1976) (sovereign acts doctrine barred price relief where excess performance costs were the result of an Executive order terminating a price freeze). The UMTRCA and its regulations are sovereign acts which the government has undertaken for the public good. Those acts are not a contractual modification of the agreement with Western Nuclear and cannot alone serve as the basis for a breach claim.
 
 C. Breach of Implied-In-Fact Contract
 
 47
 Western Nuclear, Homestake, and Pathfinder have asserted breach of implied-in-fact contract claims. Western Nuclear's theory is that it was the intent of the parties that if the government "in its capacity as a sovereign" performed a sovereign act and therefore made performance more difficult or expensive, the government would bear the added costs. Homestake's and Pathfinder's theory is that it was the intent of the parties that the plaintiffs would be compensated for all costs of production, including all costs associated with mill tailings.
 
 
 48
 The Claims Court did not err in dismissing the implied-in-fact contract claims. As explained in Porter v. United States, 496 F.2d 583, 204 Ct.Cl. 355 (1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975), an implied-in-fact contract is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Id. at 590, quoting Baltimore & O.R.R. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923). As fully set out above, the parties have admitted that the extensive tailings stabilization which is now required was not even contemplated by the parties at the time of the contracts. Therefore, there can have been no negotiation and "meeting of the minds" that could create an implied-in-fact contract respecting the cost of the stabilization.
 
 
 49
 In addition, the plaintiffs cannot in this case argue that the cost of tailings stabilization was to be borne by the government in view of the "intent" of the contracts to reimburse all costs. The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract. ITT Fed. Support Services v. United States, 531 F.2d 522, 528 n. 12, 209 Ct.Cl. 157 (1976). As fully set forth above, the plaintiffs have admitted that although the contract prices were determined by considering the plaintiffs' costs, the prices were in fact set by the contracts. The stabilization costs are not "entirely unrelated" to the costs included in the contract prices. Therefore, there can be no implied agreement to pay costs over and above those prices. Unlike the complaint in W.R. Cooper Gen. Contractor, Inc. v. United States, 843 F.2d 1362 (Fed.Cir.1988), the plaintiffs' allegations and admissions in their complaints do not even raise the possibility of the existence of an implied-in-fact contract.
 
 
 50
 Finally, the plaintiffs cannot argue that increased obligations respecting tailings disposal create an implied agreement to reimburse the additional costs. The requirement of tailings stabilization and mill decommissioning was not an exercise of the government's contractual powers, but of its powers as sovereign to act for the public good. The plaintiffs' contract claims seeking to impose liability for this sovereign act are barred by the Sovereign Acts Doctrine. Cf. Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); Owen v. City of Independence, 445 U.S. 622, 645 n. 28, 100 S.Ct. 1398, 1412-13, 63 L.Ed.2d 673 (1980); Horowitz v. United States, 267 U.S. at 461, 45 S.Ct. at 344; Hedstrom Lumber Co. v. United States, 7 Cl.Ct. 16, 25-29 (1984).
 
 
 51
 D. The Claims Court's Jurisdictional Reasoning
 
 
 52
 The Claims Court relied on its limited contractual jurisdiction under 28 U.S.C. Sec. 1491 in resolving the issues raised by the government's motion for judgment on the pleadings respecting the plaintiffs' contract claims. 15 Cl.Ct. 681, 686. The Claims Court stated that its contractual jurisdiction is conferred only when the government has agreed to be bound. Aetna Cas. & Sur. Co. v. United States, 655 F.2d 1047, 1059, 228 Ct.Cl. 146 (1981). An express or implied-in-fact contract is required; the Claims Court has no jurisdiction over an implied in law contract. See Porter v. United States, 496 F.2d at 590 n. 5.
 
 
 53
 The plaintiffs have alleged an appealing fact situation. According to the plaintiffs, the government induced them to enter the fledgling uranium industry, apparently assuring them of profits for many years. As required by the government, the plaintiffs sold much of their entire uranium output exclusively to the government. Years later, after the contracts were completed, it was determined that the tailings produced in the milling operations were potentially dangerous, and the plaintiffs were forced to stabilize them at their own expense. The plaintiffs now seek to impose an obligation on the government to reimburse those tailings costs. As discussed above, the tailings hazard was not contemplated by the parties, and the plaintiffs have alleged no contract provision requiring the government to pay the stabilization costs. Thus, any contractual claim against the government would arise, not out of the government's agreement to be bound, but out of an obligation that is imposed by law. Regardless of the alleged "justness" of the plaintiffs' claims, the Claims Court has no jurisdiction over them. The Claims Court's jurisdiction is limited, and where the government has not agreed to be bound, either expressly or impliedly, there is no contractual jurisdiction.
 
 
 54
 Moreover, the plaintiffs' circumstances are not as compelling as they might appear. The plaintiffs exercised their business judgment when they willingly entered into the uranium procurement contracts with the government without including escalation clauses. The contracts apparently provided them a guaranteed demand for their production at a profit for years. The plaintiffs have not alleged that they are protected by a price adjustment provision in the contracts or that the contracts were price redeterminable. See Bowen-McLaughlin-York, 813 F.2d at 1223. Thus, when unforeseen costs arose, their business judgment turned out to be wrong. Their breach and reformation claims cannot permit them to renegotiate their contracts in order to take into account matters not considered when the contracts were negotiated.
 
 
 55
 The merits of the plaintiffs' contract claims need not be reached. Their complaints fail to state redressable claims.
 
 II. Western Nuclear's Taking Claim
 
 56
 The Claims Court also dismissed Western Nuclear's taking claim. Western Nuclear alleged that the UMTRCA requires it to spend very large sums of money for reclamation and decommissioning of the tailings and its mill upon termination of its license. Western Nuclear alleged that the amount of money it will be required to spend is greater than the value of the mill, and that such a requirement is an unconstitutional taking under the Fifth Amendment.
 
 
 57
 The Claims Court held that Western Nuclear cannot set forth a valid taking claim in the circumstances pleaded. The Claims Court stated that there has been no physical invasion of the property, and Western Nuclear has not alleged that it has been deprived of all beneficial use of its property. The court held that the government may regulate the use of land or a business and may require the owner to spend additional revenue for health and safety reasons without the regulation being found a taking requiring compensation. Individuals hold their property subject to the limitation that they do not use it in dangerous or noxious ways. The Claims Court also observed that the government has implemented similar regulations designed to protect the public health and safety, such as the Clean Air Act, 42 U.S.C. Secs. 7401-7642 (1982). According to the Claims Court, Western Nuclear's taking theory would require compensation for those forced to comply with the national standards on air pollutants.
 
 
 58
 We hold that the Claims Court correctly dismissed Western Nuclear's taking claim. On the circumstances alleged, Western Nuclear cannot show that a compensable taking has occurred.
 
 
 59
 The power of a court to order compensation for a government action is limited. As the Supreme Court has stated,
 
 
 60
 The Fifth Amendment, which requires just compensation where private property is taken for public use, undertakes to redistribute certain economic losses inflicted by public improvements so that they will fall upon the public rather than wholly upon those who happen to lie in the path of the project. It does not undertake, however, to socialize all losses, but those only which result from a taking of property. If damages from any other cause are to be absorbed by the public, they must be assumed by act of Congress and may not be awarded by the courts merely by implication from the constitutional provision.
 
 
 61
 United States v. Willow River Power Co., 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945). Thus, the Fifth Amendment requires compensation for losses due to government action only where there has been a "taking" of "property" for public use.
 
 
 62
 In this case, Western Nuclear has not alleged a physical taking of any of its property. Its complaint alleges only that it will be required to spend sums of money for reclamation of tailings and mill decommissioning. Requiring money to be spent is not a taking of property. See United States v. Sperry Corp., --- U.S. ----, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290 (1989) (deduction of a tribunal user fee from settlement award not a physical occupation requiring just compensation). Western Nuclear belatedly asserts on appeal that the UMTRCA will require it to transfer to the government the uranium tailings, the property affected by the mill site, and the tailings disposal area and that this constitutes a permanent occupation of its property. We do not reach these arguments for the complaint that is at issue does not contain these allegations nor were they addressed in the Claims Court decision now appealed. Thus, on the facts as alleged, there has as yet been no physical taking.
 
 
 63
 The Supreme Court has not developed a set formula for determining whether a taking of property has occurred. Rather, that determination is made by engaging in ad hoc, factual inquiries into the circumstances of each particular case. Connolly v. Pension Benefit Guar. Corp., 475 U.S. at 224, 106 S.Ct. at 1025. Three factors have "particular significance": (1) the character of the government action; (2) the economic impact of the regulation on the plaintiff; and (3) the extent to which the regulation has interfered with distinct investment-backed expectations. Id. at 224-25, 106 S.Ct. at 1025-26. See also Chang v. United States, 859 F.2d 893, 895 (Fed.Cir.1988). It is not necessary in every case to undertake an evidentiary hearing on the issue of whether a taking has occurred. Summary dismissal of a taking claim is appropriate where the circumstances alleged in the complaint, even if taken as true and all reasonable inferences are drawn in favor of the plaintiff, cannot establish that a taking has occurred. See Chang (motion to dismiss for failure to state a claim); Allied-General Nuclear Services v. United States, 839 F.2d 1572 (Fed.Cir.) (summary judgment), cert. denied, --- U.S. ----, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988). In this case, examination of the circumstances alleged by Western Nuclear in light of the three factors set forth by the Supreme Court shows that the Claims Court correctly dismissed Western Nuclear's taking claim.
 
 
 64
 1. The Nature of the Government Action. The Supreme Court has recognized that the nature of the government's action is "critical" in the determination of whether a taking has occurred. Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 488, 107 S.Ct. 1232, 1243, 94 L.Ed.2d 472 (1987). In this case, the government action is the regulatory requirement to spend money for tailings stabilization and mill decommissioning as a condition of license termination. 42 U.S.C. Sec. 2113. That action does not invade or permanently appropriate Western Nuclear's property for public use. Rather, the UMTRCA safeguards the public against potential hazards of tailings radiation and radon gas emissions by requiring the owners and operators of uranium mills to stabilize the tailings and mill site to minimize the health hazards. See 42 U.S.C. Sec. 7901.
 
 
 65
 Congress set forth explicit findings regarding the need for tailings stabilization and control, and it made clear its specific purpose in enacting the UMTRCA. Congress found that "the protection of the public health, safety, and welfare and the regulation of interstate commerce require that every reasonable effort be made to provide for the stabilization, disposal, and control in a safe and environmentally sound manner of such tailings in order to prevent or minimize radon diffusion into the environment and ... other environmental hazards...." Id. The government action complained of is the result of Congress' exercise of its power in order to protect the health, safety, and welfare of the public.
 
 
 66
 In Connolly the Supreme Court considered a statute that required employers withdrawing from a pension plan to pay into the plan an additional amount corresponding to the employer's proportionate share of the plan's unfunded vested benefits. The Court held that the requirement to pay an amount greater than that which the employer was contractually obligated to pay was not a taking. The Court stated that "[t]his interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation." Id. 475 U.S. at 225, 106 S.Ct. at 1026. See also Radioptics, Inc. v. United States, 621 F.2d 1113, 1127, 223 Ct.Cl. 594 (1980) ("where the purpose of a regulation which causes interference with property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a non-essential benefit, compensation under the fifth amendment is not required.").
 
 
 67
 The uranium tailings were created by Western Nuclear's production of uranium. Congress has determined that those tailings are potentially hazardous to the public health. Pursuant to Congress' power to protect the general health, safety, and welfare, Congress has now required Western Nuclear to stabilize the tailings it has created. Such government action does not constitute a "taking." See Keystone, 480 U.S. at 491-92, 107 S.Ct. at 1245-46 ("Long ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.") (footnote and citations omitted) (quoting Mugler v. Kansas, 123 U.S. 623, 665, 8 S.Ct. 273, 299, 31 L.Ed. 205 (1887)). See also Allied-General, 839 F.2d at 1576 ("We think the basic rule that is dispositive here is that as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public.").
 
 
 68
 2. The Economic Impact of the UMTRCA. Even though the UMTRCA will require Western Nuclear to spend large amounts of money to stabilize the uranium tailings and Western Nuclear may be completely deprived of the use of that money, the financial burden of the Act cannot be considered in a vacuum. See Keystone, 480 U.S. at 497, 107 S.Ct. at 1248; Penn Central Transp. Co. v. New York City, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978). In this case, Western Nuclear has alleged that the tailings stabilization will cost more than its mill is worth. However, comparison of the cost of tailings stabilization to the value of its mill does not show the economic impact of the regulations, other than merely suggesting that the cost is a large amount. Western Nuclear has not claimed that the government has interfered with its production of uranium or has made the use of its mill unprofitable. The allegations Western Nuclear has made do not show any economic impact that would support a determination that a "taking" has occurred.
 
 
 69
 3. Interference With Investment-Backed Expectations. Finally, Western Nuclear's allegations do not show any interference with its investment-backed expectations as would support a "taking" determination. From the outset of the uranium procurement program, the nuclear industry has been highly regulated, as the plaintiffs admit. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." Connolly, 475 U.S. at 227, 106 S.Ct. at 1027, quoting FHA v. The Darlington, Inc., 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958). The only "expectation" that Western Nuclear could have under the circumstances it has alleged is that it expected it would not have to spend its own money to remediate health and environmental hazards created by its production of uranium. Such an expectation cannot be a reasonable commercial expectation.
 
 
 70
 The nature of the government action, as well as the circumstances alleged by Western Nuclear, clearly show that the UMTRCA is not a taking that requires compensation. The Claims Court correctly dismissed Western Nuclear's taking claim.
 
 CONCLUSION
 
 71
 We have considered the government's alternative arguments for affirming the Claims Court. Except as incorporated in the above discussion, they are not persuasive.
 
 
 72
 In enacting the UMTRCA, Congress chose to place the great burden of stabilizing the uranium and thorium tailings on the producers rather than on the public fisc after January 1, 1978. While this may force the plaintiffs to spend large amounts of money, they cannot show that their contracts with the government may be reformed or that the government has breached the contracts. In addition, the UMTRCA does not constitute a taking that requires compensation. For these reasons, the decision of the Claims Court is affirmed.
 
 COSTS
 
 73
 Each side shall bear its own costs on this appeal.
 
 
 74
 AFFIRMED.
 
 
 
 *
 Due to the recusal of another judge, the author was not assigned to the panel until after oral arguments in this case. The author has reviewed the audio tapes of the oral arguments. Counsel were given the opportunity to object to this procedure in open court, but did not