COMMONWEALTH EDISON
COMPANY, Plaintiff-
Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 00–5069.

United States Court of Appeals,
Federal Circuit.

Nov. 20, 2001.

Robert A. Mangrum, Winston & Strawn, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Eric J. Marcotte.

James G. Bruen, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were J. Christopher Kohn, Director; Sandra P. Spooner, Deputy Director; Theodore R. Carter, III, and Margaret Baskette, Attorneys. Of counsel were Margaret M. Newell, and Matthew J. Troy, Attorneys.

Before MAYER, Chief Judge, NEWMAN, MICHEL, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, GAJARSA, LINN, and DYK, Circuit Judges.*

* Circuit Judge Prost, who entered on duty on October 3, 2001, has not participated in the disposition of this case.

Opinion for the court filed by Circuit Judge DYK, in which Circuit Judges MICHEL, LOURIE, CLEVENGER, SCHALL, BRYSON, GAJARSA, and LINN join. Dissenting opinion filed by Chief Judge MAYER, in which Circuit Judges PAULINE NEWMAN and RADER join.

DYK, Circuit Judge.

This case is one of a large number of cases brought in the Court of Federal Claims challenging the constitutionality of the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776 (codified as amended in various sections of 42 U.S.C.) ("EPACT" or "the Act"), which imposes special monetary assessments on domestic utilities for the remediation of environmentally contaminated uranium processing facilities owned by the United States. *See* 42 U.S.C. § 2297g 1. After argument before a panel on April 4, 2001, we *sua sponte* ordered that the case be heard in banc without additional briefing. The case was heard in banc on October 3, 2001.

In light of our decision in *Consolidated Edison Co. v. United States,* 247 F.3d 1378 (Fed.Cir.2001),[1] Edison's request for a stay of the proceedings in the Court of Federal Claims has become moot.

On the merits, we conclude that requiring plaintiff Commonwealth Edison Company ("Edison") and the other domestic utilities that benefited from the uranium processing services to contribute to the remediation costs does not constitute a Fifth Amendment taking because the Takings Clause does not apply to legislation requiring the payment of money. We also

1. This opinion replaced our previous decision in that case, reported at 234 F.3d 642 (Fed. Cir.2000).

conclude that the Act does not violate the Due Process Clause of the Fifth Amendment. The retroactive application of the Act rationally furthers a legitimate legislative objective—the remediation of contaminated facilities used by the United States to process uranium for domestic utilities. Congress reasonably concluded that the utilities received benefits from the processing and that the utility processing contributed to the contamination. Liability was imposed on those utilities for only a portion of the cleanup costs. As a matter of law, Edison and other similarly situated utilities could have reasonably expected to be liable for a share of the remediation costs arising from the contamination of the processing facilities. Edison's other arguments on the merits are foreclosed by our decision in *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed.Cir. 1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998).

We therefore dismiss as moot the appeal from the denial of the stay request and affirm the decision of the Court of Federal Claims dismissing the complaint.

## BACKGROUND

This case arises against the background of our earlier decision in *Yankee Atomic* where we rejected contentions that EPACT breached uranium processing contracts between Yankee Atomic Electric Co. ("Yankee Atomic") and the United States and constituted a taking of those contract rights. Some of the claims asserted by Edison are the same as those asserted in *Yankee Atomic*. Edison also claims that the statutory obligation to pay money to the government constitutes a taking of that money, and that the retroactivity of the Act renders it unconstitutional under the Due Process Clause.

Resolution of this appeal requires a brief overview of the history of the United States government's involvement in the enrichment of low-grade uranium for Edison and other domestic utilities, as well as the provisions of EPACT.

The uranium processing facilities involved here were originally constructed and operated by the United States government for national defense purposes. Between 1945 and 1970, approximately 96% of the enriched uranium produced by the government was used for weapons production. These facilities were also capable of producing enriched uranium for nuclear power reactors.

Before 1954, United States law permitted only the United States government to own nuclear power reactors. In 1954, however, Congress enacted amendments to the Atomic Energy Act of 1954, Pub.L. No. 83–703, 68 Stat. 919, which for the first time authorized private ownership of nuclear power reactors. The government extensively regulated these reactors, *inter alia*, "to protect the health and safety of the public" from the possible environmental hazards. *Id.* at § 2 (codified as amended at 42 U.S.C. § 2210).

Plaintiff Edison is a domestic utility company with its principal place of business in Illinois. Beginning in 1960, Edison owned and operated nuclear reactors, which it used to generate electrical power for sale and distribution to its customers in Illinois. Those nuclear reactors, in turn, required enriched uranium.

Edison alleges that in 1960 it began to "purchase or lease" enrichment services from the government. However, we note that until 1964 the government retained strict control over the technology used to enrich low-grade uranium for use in nucle-

ar reactors, and barred private ownership of enriched uranium. In that year, Congress passed the Private Ownership of Special Nuclear Materials Act, Pub.L. No. 88–489, 78 Stat. 602 (1964), which authorized the private ownership of enriched uranium. After the passage of that act, the government began to offer uranium enrichment services to commercial customers like Edison.

Beginning in 1969, Edison entered into a series of multi-year contracts with the United States government in which Edison agreed to purchase uranium enrichment services from the United States. Those enrichment services were provided at enrichment plants operated first by the Atomic Energy Commission and later (beginning in 1974) by the Energy Research and Development Administration and, ultimately (beginning in 1977) by the Department of Energy (collectively, "DOE").

Under those contracts, Edison delivered low-grade uranium to the government-owned facilities for enrichment. The government took title to the low-grade uranium, processed the uranium, and returned enriched uranium to Edison. The enrichment services were measured in terms of "separative work units" ("SWUs"). The plaintiff here, like other domestic utilities, paid for the services by multiplying the number of SWUs provided by the unit price set forth in its contracts with the government. Although the utilities' contracts varied somewhat, each stated that the price paid by the utility for the enrichment services would be based on an "established Commission pricing policy," defined under the contracts as the price in effect at the time the service was rendered. A number of these contracts also capped the maximum per unit charge for the enrichment services. Edison alleges in its complaint that it purchased a portion of its uranium enrichment services "with the Government's knowledge and consent, from other sources." First Amended Complaint of Plaintiff–Appellant Commonwealth Edison Company (hereinafter "Complaint") at ¶ 50.

Edison alleges that "[b]y the late 1970s and early 1980s, foreign suppliers of uranium enrichment services emerged, threatening the Government's monopoly power and creating significant competition for the Government." *Id.* at ¶ 41. Edison further alleges that the Government's share of the uranium processing market "declined substantially, from nearly 100% in the 1960s and 1970s, to below 50% in 1983." *Id.* Edison elected, however, to continue to use government processing facilities even though those foreign alternatives became available.

In January 1984, the government developed a standard requirements-type contract for uranium enrichment services, referred to as a Utility Services Contract. In July 1984, Edison entered into a Utility Services Contract after terminating all of its existing uranium enrichment services contracts with the government through a Supplemental Agreement of Settlement ("Settlement Agreement"). This Utility Services Contract, like the previous contracts, charged the utilities for the services according to the "established pricing policy," and likewise capped the maximum unit charge. It appears that the government developed this Utility Services Contract, at least in part, at the request of Edison and the other domestic utilities.

As a result of the government's use of the processing facilities for national defense purposes, they had become contaminated, even before the utilities' uranium processing commenced. Although Edison alleges that the facilities were "fully con-

taminated with radioactive and other hazardous materials" before they began to be used for the processing of the utilities' uranium, Complaint at ¶ 23, there is no question that the processing of the utilities' uranium caused the same type of contamination as the government's earlier use of the facilities to enrich uranium for weapons purposes. Indeed, Edison at oral argument specifically conceded that that was the case, and agreed that contamination cleanup costs are incurred any time uranium is enriched, including when it is enriched for the benefit of the utilities. Edison alleged, however, that the cleanup costs were not "materially" increased by the later contamination resulting from the utility uranium processing.[2]

Edison also admits in its complaint that the obligation to decontaminate and decommission the facilities "was an obligation well understood by operators of nuclear facilities throughout the industry." Complaint at ¶ 31. Although the contracts provided for recovery of the government's costs of operating the plants and fixed the price as of the time of delivery, the original contracts, the Utility Services Contract, and the Settlement Agreement did not expressly preclude (or even address) the government's future assignment to Edison of any remediation costs for the decontamination of the government's uranium enrichment facilities.[3]

These remediation costs were addressed by Congress in 1992. Faced with its declining share of the uranium processing market, Congress decided to restructure the government's uranium processing ser-

---

**2.** At oral argument, counsel for Edison explained Edison's contribution to the contamination as follows:

COUNSEL FOR EDISON: If it can be demonstrated—in our cases there's nothing in the record—but if it can be demonstrated that there was additional cost associated with the enrichment being—services provided to the commercial utilities, then perhaps there would be an argument that we have a certain responsibility. . . .

THE COURT: Well, of course there are. You can't run a nuclear enrichment program without creating contamination, so of course—we can quarrel about exactly how to measure them or how big they are, but of course there are contamination cleanup costs.

COUNSEL FOR EDISON: There are. Let me try to make an analogy. . . . I know in terms of nuclear utilities, when they have boiling water, nuclear generated, and they periodically are required to decontaminate, what they do is they have these very large deep swimming pool type reactors. What they do is paint the well of the reactor with a rubberized paint that the contamination adheres to. Then they peel that paint off and the—. . . The contamination adheres to that paint. So regardless of whether there is a half inch of contamination or a full inch of contamination, all the contamination adheres

to that rubberized paint and you just peel it off, and the cost is no more.

THE COURT: Well, that's basically your point, that the processing of the utilities' uranium caused pollution, but it didn't cost any more to clean it up than it would have cost to clean up the weapons pollution, right?

COUNSEL FOR EDISON: Exactly. Yes, Sir.

**3.** The Utility Services Contract merely stated, in pertinent part, that:

[T]he Customer and DOE desire to terminate all previous long-term contracts between the Customer and DOE for the furnishing of uranium enrichment services *in order to accommodate the Customer's desire to obtain such services under the Utility Services form of uranium enrichment services contract* . . . .

(Emphasis added.). That contract further provided that "the unit charge for enrichment services under this contract shall not exceed a ceiling charge of $135.00 per separative work unit through September 30, 1985."

The Settlement Agreement provided that "the Government agrees that all obligations arising under the [previous] contracts or by reason of their termination shall be deemed to be concluded."

vices in order to remain competitive with its overseas providers. Congress created a new, for-profit, governmental corporation called the United States Enrichment Corporation ("USEC") to provide those services to Edison and other domestic utilities.

At the same time that it created the USEC, Congress in EPACT addressed the need to decontaminate and decommission the government's uranium enrichment facilities. The DOE "estimated that the total cost of this clean up could exceed $20 billion over 40 years, which amounted to about $500 million per year, indexed to inflation." *Yankee Atomic*, 112 F.3d at 1572. As this court noted in *Yankee Atomic*, "[b]ecause [the magnitude of] this decontamination and decommissioning fiscal problem was not [fully] recognized until the 1980s, the prices charged in the Government's past uranium enrichment contracts had not accounted for the problem." *Id.*

EPACT established a Uranium Enrichment Decontamination and Decommissioning Fund (the "Fund") to accumulate over a fifteen-year period the funds necessary to remediate the uranium enrichment facilities. 42 U.S.C. §§ 2297g, 2297g 1. The Act provided that the costs were to be shared by the government and those domestic utilities that benefited from processing at government facilities. The Act accordingly provided that the annual deposits of $480 million (adjusted for inflation) would come from two sources: (1) up to $150 million (or up to approximately 32% of the total amount) was to be collected as a special assessment from domestic utilities[4] that purchased (on the primary

or secondary markets) the uranium enriched at these facilities; and (2) the balance of at least $330 million—the lion's share of the costs, amounting to at least 68%—was to be paid by the government. The Act further provided that the imposition of these special assessments on Edison and the other utilities would cease after the earlier of 15 years after October 24, 1992 (the date of EPACT's enactment) or the collection of $2.25 billion (again adjusted for inflation) from the domestic utilities. *See* 42 U.S.C. § 2297g–1.

Under the Act, the special assessment imposed on each domestic utility was based on the percentage of SWUs purchased from the DOE relative to the total number of SWUs produced by the DOE. 42 U.S.C. § 2297g–1(c). As noted above, the Act provided that a domestic utility was considered to have purchased a SWU from the DOE if the SWU was originally produced by the DOE, even if the utility actually purchased it from another source. Similarly, a utility was not considered to have purchased a SWU from the DOE if it subsequently resold that SWU to another utility. As this court noted in *Yankee Atomic*, "[i]n sum, the Act impose[d] the assessment upon whichever utility company eventually use[d] the enrichment services." 112 F.3d at 1572.

Two groups of purchasers of uranium enrichment services were exempt from the special assessment: (1) domestic utilities that purchased USEC services any time after 1992; and (2) foreign utilities, which represented 25% of DOE's pre–1992 customer base. *See Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 33 n. 1 (2000); *see also* Complaint at ¶ 25 (alleging

---

4. The implementing regulations for the Fund defined "domestic utility" as any utility in the United States that purchased SWUs from the government between 1945 and October 23, 1992. *See* 10 C.F.R. § 766.3. It is undisputed that Edison meets this definition.

that sales to foreign utilities historically "accounted for approximately 25% of the Government's commercial uranium enrichment market").

EPACT also provided the utilities with a "pass-through" provision, providing in pertinent part that the special assessment "shall be deemed a necessary and reasonable current cost of fuel and shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost." 42 U.S.C. § 2297g–1(g). This statutorily mandated pass-through provision was binding on state regulatory agencies. *See Mississippi Power & Light Co. v. Mississippi,* 487 U.S. 354, 369–72, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 962–65, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). At oral argument, counsel for Edison conceded that Edison sought to recover the costs of the special assessment by passing the costs through to Edison's customers, though counsel expressed some doubt whether Edison recovered those costs in light of deregulation of the market and the competitive rates that deregulation produced.

The cost-sharing provisions were enacted after "much congressional debate over the issue of how these costs should be recovered, especially to what extent DOE's nuclear utility customers should be expected to share in paying for these costs." 138 Cong. Rec. H11,399, H11,401 (1992) (statement of Rep. Phillip Sharp on Conference Report), *reprinted in* Senate Comm. On Energy & Natural Res., 103d Congress 2d. Sess., *6 Legislative History of the Energy Policy Act of 1992,* at 4519, 4553 (Comm. Print 1994). Ultimately, the utilities'

share was limited to 32% even though the House Report concluded that "[h]istorical production from these plants ha[d] been divided almost evenly between the government and commercial sectors." H.R.Rep. No. 102–474(I), at 144 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953, 1967.

Indeed, Edison and other utilities participated actively in shaping the legislation that became EPACT and approved the concept of cost sharing. *See Comprehensive National Energy Policy Act: Hearings on H.R. 776 Before the House Comm. on Ways & Means,* 102d Cong. 170–83 (1992) ("Committee Hearings I"). During the course of EPACT's consideration, the House Committee on Energy and Commerce proposed to impose "a $419 million annual liability, or a $9 billion [liability] over 20 years," on the utility industry for remediation of the enrichment facilities. *Id.* at 181. In Edison's case the company estimated that this funding proposal, if enacted, would increase its uranium enrichment costs by "one third" over the amount it had already agreed to pay. *Id.*

In the hearings on EPACT, Edison's President complained that the industry was being asked to pay a "disproportionate share" of the costs, and, as in the present Complaint, stated that "virtually all the contamination at [the government enrichment] facilities occurred during the first 20 years of operations, when operations were strictly for the defense program." *Id.* at 180–81 (statement of Bide L. Thomas, President, Commonwealth Edison Co., *et al.*).[5] Edison offered no independent study of the industry's relative contribution to the contamination and relied entirely on the testimony of the De-

---

**5.** This testimony was a joint statement of Bide L. Thomas; Michael R. Peevey, President, Southern California Edison Co.; and Joseph

M. Farley, Chairman and Chief Executive Officer, Southern Nuclear Operating Co. *See id.* at 178.

partment of Energy. That testimony, by Assistant Secretary for Nuclear Energy William Young, was that "there is additional pollution in the area of the sites [of the enrichment facilities] because of commercial operations subsequent to the exclusive operation [of the facilities] for the government." *Department of Energy Budget Request for Fiscal Year 1993: Oversight Hearing Before the Subcomm. On Energy and the Env't of the House Comm. on Interior and Insular Affairs,* 102d Cong. 80 (1992) ("Committee Hearings II"). He estimated the remediation costs for that portion of the pollution attributable to the enrichment of the utilities' uranium amounted to approximately $1.6 billion, out of a total cost of approximately $18.5 billion. He concluded that "[i]f you look at it from a polluter-pays basis, about $1.6 billion of that $18.5 billion would be properly allocated to commercial customers" of the enrichment facilities. *Id.* at 79.[6]

Based on Edison's view of the industry's responsibility for the contamination, Edison reaffirmed its and other utilities' "willingness to pay a fair share of the [decontamination and decommissioning costs] for these [enrichment] facilities." Committee Hearings I at 182; *see also id.* at 172 ("[T]he industry is willing to participate in the cleanup program ....") (testimony of Bide L. Thomas, President, Commonwealth Edison Company). But Edison and other utilities objected that their share should not exceed the $1.6 billion estimated by the Department of Energy, and sought "a cap to protect ratepayers from being assessed more than their fair share of costs." *Id.* at 181. Edison and other utilities urged Congress to adopt a compromise funding proposal—one adopted by the House Committee on Science, Space and Technology (the "Science Committee")—that would have capped the utilities' liability for the remediation costs at $2.5 billion. Edison and two other utilities

---

6. Assistant Secretary Young further explained this proposed allocation when questioned by Representative Kostmayer during his testimony:

MR. KOSTMAYER: Who else did the polluting besides the government?

MR. YOUNG: In some cases, there is additional pollution in the area of the sites because of [the] commercial operations subsequent to the exclusive operation for the government. Some of the tailings are there as a result of commercial operations, for example.

MR. KOSTMAYER: Commercial operations conducted by some party other than the government?

MR. YOUNG: No, no. We have run the diffusion plants. A certain amount of the tails are there because of [the] SWUs produced for the government. Another certain amount of the tails are there because of SWUs produced for commercial customers.

. . .

MR. YOUNG: ... The largest piece of [the estimated total cleanup cost] is $14 billion

which is [decontamination and decommissioning] of the buildings and systems themselves. Of that, because of the government operation having led to the contamination, we are saying the government would pay 100 percent of that.

There are two other elements of the cleanup that has got to take place. One is on the grounds around the facilities and we are saying that some of the contamination that occurred in the ground resulted not solely from the 20 years of government operation, but a measurable amount more resulted from the commercial—or operation to the benefit of commercial customers. And since we did not pass those costs on in the past, we feel it is equitable to pass those costs on in the future.

Further, with the tails, some of the tails were created for the benefit of commercial customers, and the portion that was, and again, not passed on in the past, we feel it is equitable to pass it on to commercial customers at this time.

Committee Hearings II at 80–81.

stated, on behalf of themselves and two industry interest groups,[7] that:

> While $2.5 billion is significantly more than the $1.6 billion that DOE estimates the civilian sector should contribute [to the remediation of the enrichment facilities], *the industry is willing to accept this compromise in the interest of providing certain liability levels and to move forward with this restructuring legislation and [decontamination and decommissioning] program.*

*Id.* at 182. (Emphasis added.). The liability cap proposed by the Science Committee, which Edison viewed as protecting its ratepayers from paying more than "their fair share of [remediation] costs," essentially became the cap in the legislation that Edison now challenges, though the ultimate liability of the utilities under the enacted legislation was more certain than under the Science Committee proposal. *See* 42 U.S.C. § 2297g–1.

Following the enactment of EPACT in 1992, as well as corresponding DOE regulations implementing EPACT, the government assessed Edison and similarly situated domestic utilities on an annual basis for each utility's share of the special assessment. Edison alleges that as of the date of the complaint, it had paid the government approximately $95.5 million in seven special assessments for the decontamination and decommissioning of the enrichment facilities. These special assessments covered the period from 1969, when Edison first began to purchase uranium processing services from the government, until 1992, the year of EPACT's enactment.

## PROCEEDINGS BELOW

On April 9, 1997, Edison commenced an action in the Court of Federal Claims challenging the legality of the special assessments authorized by the Act. Edison's original complaint alleged that the special assessment breached its contracts with the government by retroactively increasing the cost of the uranium enrichment services and constituted an impermissible taking of those contracts in violation of the Fifth Amendment. *See, e.g.,* Original Complaint of Plaintiff Appellant Commonwealth Edison Company at ¶¶ 53, 68–69. On May 6, 1997, during the pendency of Edison's action, this court issued its decision in *Yankee Atomic* rejecting identical claims made by another utility.

Following our decision in *Yankee Atomic,* Edison filed a new and separate action for declaratory and injunctive relief in the United States District Court for the Southern District of New York seeking to invalidate EPACT and to bar the government from attempting to compel future payments under the Act (the "New York action"). The district court subsequently denied a motion by the United States to transfer the case to the Court of Federal Claims. *Consol. Edison Co. v. United States,* 45 F.Supp.2d 331 (S.D.N.Y.1999). In *Consol. Edison Co. v. United States, Dept. of Energy,* 247 F.3d 1378 (Fed.Cir. 2001), we reversed that decision and instructed the district court to transfer the New York action to the Court of Federal Claims for adjudication.

On November 6, 1998, Edison also filed a motion in the Court of Federal Claims to

---

**7.** These interest groups were the American Nuclear Energy Council ("ANEC") and the Edison Electric Institute ("EEI"). ANEC "represents over 100 domestic and international organizations that have an interest in nuclear energy." EEI, in turn, "is the national association of investor-owned electric companies" and represents "approximately three-quarters of all American electricity customers." Committee Hearings I at 178.

stay proceedings in that court pending resolution of the New York action. On February 2, 1999, Edison amended its original complaint in the Court of Federal Claims to state new and additional theories for recovery. The amended complaint stated essentially three theories for recovery. Edison alleged that the special assessments imposed by EPACT: (1) constituted an unlawful taking of money under the Takings Clause of the Fifth Amendment; (2) constituted a breach of contract, inasmuch as "[t]he fixed price nature of [Edison's] enrichment contracts, coupled with the additional release granted by the Government pursuant to the termination of certain of those contracts, provided [Edison] with an unmistakable promise that it would not be subject to future liability to the Government based upon its contractual purchases of enrichment services"; and (3) constituted an illegal exaction in violation of the Due Process Clause of that amendment. The government moved to dismiss the amended complaint for failure to state a claim.

On February 3, 2000, the Court of Federal Claims denied Edison's motion for a stay, noting, in part, that the original action in the Court of Federal Claims was the first filed action and that it "has the jurisdiction to rule on each of the counts in the amended complaint and thus need not defer to the district court's broader jurisdiction." *Commonwealth Edison,* 46 Fed. Cl. at 34. In a well-reasoned opinion, the Court of Federal Claims also granted the government's motion to dismiss, concluding that neither the old nor new theories of recovery stated a claim. That court rejected Edison's first claim—that EPACT constituted an impermissible taking of Edison's property without just compensa-

tion—on the ground that "a government-imposed payment of money cannot result in a compensable taking." *Id.* at 41.

The court dismissed the utility's claim that the imposition of the special assessments constituted a taking of its contract rights with the government, finding that "this issue was squarely addressed" in this court's decision in *Yankee Atomic. Id.* at 46. In reaching this conclusion, the court rejected Edison's arguments that its contracts with the government were significantly different from those contracts at issue in *Yankee Atomic. Id.*

Finally, the court rejected Edison's claim that the special assessment constituted an illegal exaction barred under the Due Process Clause. Recognizing the well-established principle that "an economic statute, such as the Energy Policy Act, comes to the court with a presumption of validity," *id.* at 43, the Court of Federal Claims determined that although the Act is indeed retroactive, "it cannot be said that the retroactivity of the Act is irrational or that that retroactivity unfairly impacted on the plaintiff." *Id.* at 44 (citing *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 18, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). The court further held that "the liability imposed by the special assessment is neither disproportional nor excessive," as EPACT imposed "liability only on those utilities that benefited from the government's uranium enrichment services." *Id.* at 45.

This timely appeal followed. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).[8]

## DISCUSSION

### I

■ As an initial matter, we note that the decision of the Court of Federal

---

8. *Amicus Curiae* briefs in support of Edison were filed in this case by Sacramento Munici-

pal Utility District and Maine Yankee Atomic Power Co.

Claims to deny Edison's request for a stay of those proceedings pending resolution of the New York action is now moot, in light of our decision in *Consolidated Edison,* 247 F.3d 1378, in which we instructed the United States District Court for the Southern District of New York to transfer that action to the Court of Federal Claims.

Accordingly, the only question before us is whether the Court of Federal Claims erred in dismissing this action for failure to state a claim upon which relief may be granted. We review that decision without deference. *First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1286–87 (Fed.Cir.1999). In so doing, we also "assume that all well-pled factual assertions are true and make all reasonable inferences in favor of" Commonwealth Edison, *New Valley Corp. v. United States,* 119 F.3d 1576, 1580 (Fed.Cir.1997), to the extent that such allegations are relevant to the constitutional issues.

## II

Ever since the New Deal Supreme Court's discarding of the *Lochner*[9] line of substantive due process cases, the Court has repeatedly held that economic legislation "adjusting the burdens and benefits of economic life" is to be judged under a deferential standard. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). There remain, however, at least three areas in which judicial review of federal legislation imposing regulatory burdens still bites. Not surprisingly, Edison relies on each of these three theories.

▪▪▪ First, there are the takings cases, in which the government is alleged

to have taken property without just compensation under the Fifth Amendment. The Supreme Court has made clear that government regulation can constitute a taking of property requiring compensation. *See, e.g., Lucas v. So. Carolina Coastal Council,* 505 U.S. 1003, 1027–28, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). It is also clear that a fund of money can be property protected under the Takings Clause. *See Phillips v. Washington Legal Found.,* 524 U.S. 156, 160, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) (holding that interest income generated by funds held in IOLTA accounts is private property of the owner of the principal for purposes of the Takings Clause); *see also Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 164–65, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (holding that the Takings Clause can apply to monetary interest generated from the operation of a specific, separately identifiable fund of money). However, although a minority of the Supreme Court has urged that a taking can occur when Congress has imposed an obligation to pay money, *see Eastern Enterprises v. Apfel,* 524 U.S. 498, 537, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), we are bound to follow the views of a majority of the Supreme Court.

In *United States v. Sperry Corp.,* 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), the Supreme Court held that a federal statute that required the payment of a portion of an arbitral award from the Iran–United States Claim Tribunal to the United States government did not violate the Takings Clause because, in part, "[i]t is artificial to view deductions of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible." *Id.* at 62 n. 9, 110 S.Ct. 387.

9. *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

In *Eastern Enterprises,* five justices of the Court rejected the theory that an obligation to pay money constitutes a taking. There, the Supreme Court confronted a constitutional challenge to the retroactive liability provisions of the Coal Industry Retiree Health Benefit Act of 1992, codified at 26 U.S.C. §§ 9701–9722 (the "Coal Act"). The Coal Act required coal operators such as petitioner Eastern Enterprises ("Eastern") to fund future health benefits of current and former coal mine employees. There was no majority opinion of the Supreme Court. Writing for the plurality, Justice O'Connor, joined by three other justices, concluded that the retroactive impact of the Coal Act as applied to Eastern Enterprises resulted in an unconstitutional taking of property because it placed a "severe, disproportionate and extremely retroactive burden on Eastern." *Eastern Enters.,* 524 U.S. at 538, 118 S.Ct. 2131.

Justice Kennedy in his concurrence, however, disagreed with the plurality's conclusion that the Coal Act resulted in an unconstitutional taking of property:

> Our cases do not support the plurality's conclusion that the Coal Act takes property. The Coal Act imposes a staggering financial burden on the petitioner, Eastern Enterprises, but it regulates

the former mine owner without regard to property. It does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest. The Coal Act does not appropriate, transfer, or encumber an estate in land (*e.g.,* a lien on a particular piece of property), a valuable interest in an intangible (*e.g.,* intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits.

*Id.* at 540, 118 S.Ct. 2131. The four dissenters in *Eastern Enterprises* (Justices Stevens, Souter, Ginsburg, and Breyer) agreed that the Takings Clause was not implicated because "[t]he 'private property' upon which the [Takings] Clause traditionally has focused is a specific interest in physical or intellectual property. . . . This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money. . . ." *Id.* at 554, 118 S.Ct. 2131 (Citations omitted.).

Thus five justices of the Supreme Court in *Eastern Enterprises* agreed that regulatory actions requiring the payment of money are not takings. We agree with the prevailing view that we are obligated to follow the views of that majority.[10]

This court has similarly concluded that the imposition of an obligation to pay mon-

---

10. *See Parella v. Ret. Bd. of the R.I. Employees' Retirement Sys.,* 173 F.3d 46, 58 (1st Cir.1999) (upholding state statute temporarily withholding excess retirement benefits against a Takings Clause challenge because "a majority of justices found that the Takings Clause did not apply under the facts of *Eastern Enterprises,* because they concluded that a Takings Clause issue can arise only after a plaintiff's property right has been independently established"); *Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 659 (3d Cir.) ("[W]e are bound to follow the five-four vote against the takings claim in Eastern."), *cert. denied,* 528 U.S. 963, 120 S.Ct. 396, 145 L.Ed.2d 309 (1999); *Hol-* *land v. Big River Minerals Corp.,* 181 F.3d 597, 606 (4th Cir.1999) (following Supreme Court in holding Takings Clause inapplicable to the Coal Act because five Justices in *Eastern Enterprises* reasoned that "no identifiable property interest was infringed by the legislation"), *cert. denied,* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000); *but see U.S. Fidelity & Guar. Co. v. McKeithen,* 226 F.3d 412, 416 (5th Cir.2000) (citing *Eastern Enterprises* but analyzing a Takings Clause challenge to retroactive assessments under the Louisiana Workers' Compensation Fund under *ad hoc,* fact-specific factors), *cert. denied,* 532 U.S. 922, 121 S.Ct. 1360, 149 L.Ed.2d

ey does not constitute an unconstitutional taking of property. In *Atlas Corp. v. United States*, 895 F.2d 745 (Fed.Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), for example, we considered the constitutionality of the Uranium Mill Tailings Radiation Control Act ("UMTRCA"), Pub.L. No. 95–604, 92 Stat. 3021 (1978), which required that uranium producers spend large sums of money to clean up uranium tailings piles, a by-product of uranium manufacture. We held that the UMTRCA's imposition of the obligation to pay money to clean up the tailings piles did not constitute an unconstitutional taking of property under the Takings Clause:

> In this case, [the uranium producer] has not alleged a physical taking of any of its property. Its complaint alleges only that it will be required to spend sums of money for reclamation of tailings and mill decommissioning. Requiring money to be spent is not a taking of property.

*Id.* at 756 (citing *United States v. Sperry Corp.*, 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989)).

In short, while a taking may occur when a specific fund of money is involved, the mere imposition of an obligation to pay money, as here, does not give rise to a claim under the Takings Clause of the Fifth Amendment.

## III

█ The second area, represented by the Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), involves contracts in which the government has agreed to pay damages if it engages in certain types of regulation.

A similar contract claim was made with respect to the present contracts and rejected by this court in *Yankee Atomic*. In that case, this court was confronted with a claim that the special assessments imposed under EPACT breached the utility's fixed-price contracts with the government by, "in effect, retroactively increasing the price that it must pay for the previously supplied uranium enrichment services." 112 F.3d at 1573. Relying on the analysis prescribed by the Supreme Court's decision in *Winstar*, we held that the imposition of the special assessments was a lawful exercise of Congress's taxing power under the sovereign acts doctrine, and was not designed to retroactively increase the price of the government's earlier contracts with Yankee Atomic. *Id.* at 1575. In other words, this court concluded that the special assessments constituted "a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Id.* at 1577.

We further held that because the contracts between the plaintiff in that case and the government "did not include an unmistakable promise that precluded the Government from later imposing an assessment upon all domestic utilities that employed the DOE's uranium enrichment services," *id.* at 1580, the special assessments imposed by the Act did not constitute a breach of contract. We similarly disposed of the plaintiff's takings claim by

---

289 (2001); *United States v. Hercules, Inc.*, 247 F.3d 706, 722 (8th Cir.2001) (stating that "inquiry into the constitutionality of CERCLA ... would be 'essentially ad hoc and fact intensive'" (quoting *Eastern Enterprises*, 524 U.S. at 523, 118 S.Ct. 2131)).

concluding that "[b]ecause the contracts did not contain an unmistakable promise against a future assessment, [the utility] had no property right (via a vested contract right) which was subsequently taken by the assessment." *Id.* at 1580 n. 8. This court denied Yankee Atomic's motion to rehear the case in banc, 112 F.3d 1569 (Fed.Cir.1997), and the Supreme Court denied certiorari, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998).

We reject Edison's request that we distinguish our decision in *Yankee Atomic.* There is no meaningful difference between the contract theories asserted here and in *Yankee Atomic,* and we therefore agree with the Court of Federal Claims' conclusion that Edison's claims based on its contracts with the government are barred by that decision. This also disposes of Edison's argument that the Act constitutes a taking of Edison's supposed contract rights to be free of future government assessments.

## IV

■ The third area of judicial review occurs where a regulation is retroactive and accordingly implicates the Due Process Clause. The Supreme Court has made clear that federal legislation is to be construed to avoid retroactivity.[11] No such issue is presented here since the statute is clear on its face, and no party urges that a narrowing construction is either possible or appropriate. Accordingly, we must address the Due Process issue.

The standard of review in this area is well-settled. As the Supreme Court stated

in *Turner Elkhorn,* 428 U.S. at 15, 96 S.Ct. 2882, "[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." So too the Supreme Court observed in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984):

> Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.

*Id.* at 729, 104 S.Ct. 2709 (citing *Turner Elkhorn,* 428 U.S. at 15–16, 96 S.Ct. 2882). Where the basis for the challenge is retroactivity, the Supreme Court has held that Due Process is satisfied "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.* at 730, 96 S.Ct. 2882.

■ In judging the rationality of legislation under the Due Process Clause, an evidentiary trial of facts, such as the relative contributions of weapons processing and utility fuel processing to the total contamination at the government plants, is not required. Rather, as the Supreme Court has noted in another context:

> the question is whether the legislative conclusion [to enact the statute] was rea-

---

11. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent."); *Bowen v. George-* *town Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

sonable and supported by substantial evidence in the record before Congress. In making that determination, we are not to re-weigh the evidence *de novo*, or to replace Congress' factual predictions with our own. Rather, we are simply to determine if the standard [of review] is satisfied. If it is, summary judgment . . . is appropriate regardless of whether the evidence is in conflict.

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 211, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (Citations omitted.). In short, legislative facts control the analysis. In these Due Process cases the federal courts are not assigned the task of making policy, determining a fair outcome, or determining the actual state of facts. We are charged simply with determining whether the congressional action was rational.

Under that rational purpose standard it will be a rare circumstance where federal legislation that is retroactive will be held unconstitutional under the Due Process Clause. In the modern era this has occurred on only a very few occasions, even if we count *Eastern Enterprises* as being such a case. *See Nichols v. Coolidge*, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927); *Blodgett v. Holden*, 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (per curiam); *R.R. Ret. Bd. v. Alton R.R. Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935); *Eastern Enters.*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451.[12]

The cases that invalidated these statutes were most unusual.

Both *Blodgett v. Holden* and *Nichols v. Coolidge* involved the government's retroactive application of revenue statutes to transactions made well before the enactment of the respective statutes. The Supreme Court held in both cases that such retroactive application violated due process. *Blodgett*, 275 U.S. at 147, 48 S.Ct. 105; *Nichols*, 274 U.S. at 542–43, 47 S.Ct. 710.[13]

In *United States v. Carlton*, 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994), the Court questioned the continuing relevance of those decisions to present day challenges to retroactive statutes, concluding that "[t]hose cases were decided during an era characterized by exacting review of economic legislation under an approach that has long since been discarded." *Id.* at 34, 114 S.Ct. 2018. In any event those decisions were limited to situations involving a "wholly new tax." *Id.* EPACT, unlike the statutes at issue in those two cases, is not a mere revenue-raising measure. Rather, it represents an assessment on particular existing domestic utilities, which Congress concluded benefited from the government's operation of the uranium enrichment facilities, and which Congress also concluded were themselves partially responsible for the problem the statute seeks to remedy.

In *Alton*, the Court invalidated a statute that required railroads to establish a pension fund covering both current employees and former employees who had worked for the railroad within the year before passage

---

12. *Cf. United States v. Sec. Indus. Bank*, 459 U.S. 70, 78–82, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) (declining to retroactively construe a provision of the Bankruptcy Reform Act, Pub.L. No. 95–592, 92 Stat. 2549 (1978), without clear evidence of Congressional intent to apply that statute retroactively, and expressing "substantial doubt whether the ret-

roactive" application would "comport with the Fifth Amendment").

13. *Untermyer v. Anderson*, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928), involved a challenge to the same statute at issue in *Blodgett*, and reached the same result.

of the statute because of the retroactive effect of the statute. *Alton* bears little resemblance to this case, and it appears that *Alton,* in any event, has effectively been overruled. *See Pension Benefit,* 467 U.S. at 733, 104 S.Ct. 2709 (questioning whether *Alton* " 'retains vitality' despite the changes in judicial review of economic legislation that have occurred in the ensuing years"); *see also Turner Elkhorn,* 428 U.S. at 19, 96 S.Ct. 2882. We note that neither Edison nor any of its amici relies on *Alton.*

*Eastern Enterprises,* which is the focus of the parties' attention, is also starkly different from this case. There, the employees' claims of entitlement to the payment of future health benefits arose from a number of National Bituminous Coal Wage Agreements ("NBCWAs" or "Agreements") between the employees' union and various coal mine operators. The statute in *Eastern Enterprises* was justified on the ground that expectations of future benefits had been created by these agreements. A majority of the Court concluded that the obligation to pay benefits could not be imposed on companies that had no role in creating those expectations.

The plurality noted that Agreements negotiated in 1974, 1978, and subsequently first suggested an industry commitment to the funding of health benefits for former employees and their dependents. *Eastern Enters.,* 524 U.S. at 530, 118 S.Ct. 2131. The plurality emphasized, however, that Eastern "ceased its coal mining operations in 1965 and neither participated in negotia-

tions nor agreed to make contributions in connection with the [employees'] Benefit Plans under the 1974, 1978 or subsequent NBCWA's." *Id.* Under the particular facts of that case, the plurality accordingly reasoned that the Coal Act's retroactive provisions violated the Takings Clause of the Fifth Amendment. In his concurrence, Justice Kennedy agreed with the plurality that the particular facts of the case warranted the invalidation of the statute, but based his reasoning on Due Process grounds. He wrote:

> Eastern was once in the coal business and employed many of the beneficiaries, but it was not responsible for their expectation of lifetime health benefits. . . . As the plurality opinion discusses in detail, the expectation was created by promises and agreements made long after Eastern left the coal business. Eastern was not responsible for the resulting chaos in the funding mechanism caused by other coal companies leaving the framework of the [NBCWA]. This case is far outside the bounds of retroactivity permissible under our law.

524 U.S. at 550, 118 S.Ct. 2131 (Kennedy, J., concurring).

Even if the *Eastern Enterprises* plurality and concurrence could be read together to announce a binding holding on the Due Process issue,[14] this case does not involve the imposition of liability on companies having no responsibility for creating the expectation of a future benefit. Rather, it involves a congressional determination to

---

14. The District of Columbia Circuit has concluded that the plurality and concurrence in *Eastern Enterprises* cannot be combined into a single holding on the Due Process issue. *Ass'n of Bituminous Contractors v. Apfel,* 156 F.3d 1246, 1254–55 (D.C.Cir.1998) ("Justice Kennedy's concurrence in the judgment is of no help in appellant's efforts to cobble together a due process holding from *Eastern Enterprises* ' fragmented parts. . . . Justice Kennedy's due process reasoning can in no sense be thought a logical subset of the plurality's takings analysis.").

impose liability on companies that received a benefit, the production of which benefit contributed to a societal problem.

On the other side of the balance, on more than ten occasions, the Supreme Court has rejected challenges to economic legislation based on the Due Process Clause of the Fifth Amendment. *See United States v. Carlton*, 512 U.S. 26, 35, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (upholding a retroactive amendment to the federal estate tax, even though the taxpayer received no advance notice of the amendment and relied to his detriment on pre-amendment law); *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 636–41, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (upholding retroactive withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act ("MPPAA") which assessed employer nearly $300,000 for its withdrawal from a pension plan prior to the effective date of the MPPAA); *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191–92, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (finding that Michigan workers' compensation statute did not violate the Due Process Clause, even though it required the petitioners to pay nearly $25 million for retroactive benefits to disabled employees); *United States v. Sperry Corp.*, 493 U.S. 52, 64–65, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (upholding retroactive imposition of an arbitration fee on prevailing parties before the Iran United States Claim Tribunal); *United States v. Hemme*, 476 U.S. 558, 571, 106 S.Ct. 2071, 90 L.Ed.2d 538 (1986) (rejecting Due Process challenge to statutorily-prescribed transitional rule that retroactively applied to gifts made before enactment of rule); *United States v. Locke*, 471 U.S. 84, 105–06, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (upholding the retroac-

tive application of the filing requirements of the Federal Land Policy and Management Act of 1976 ("FLPMA"), codified at 43 U.S.C. § 1744, that resulted in the forfeiture of mining claims made before the enactment of the FLPMA); *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 475–79, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (upholding legislation requiring private railroads to reimburse Amtrak for rail travel privileges provided by Amtrak to the private railroads' employees and former employees even though Amtrak for some years had not ·imposed such costs on the private railroads); *Pension Benefit*, 467 U.S. at 731–32, 104 S.Ct. 2709 (upholding the retroactive application of the withdrawal liability provisions of the MPPAA during period before the MPPAA's enactment); *United States v. Darusmont*, 449 U.S. 292, 296–302, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981) (upholding the retroactive application of an amendment to the federal tax statute to transactions made before enactment of amendment); *Turner Elkhorn*, 428 U.S. at 18, 96 S.Ct. 2882 (upholding requirement that coal mine operators compensate former employees disabled by work-related illnesses, even though those operators had never contracted for such liability, and the employees involved were no longer employed by the operators); *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958) (upholding application of statutory requirement that occupants of mortgaged housing must be residents as opposed to transients to apartment buildings mortgaged prior to enactment of the statute); *Lichter v. United States*, 334 U.S. 742, 788, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (upholding statute permitting government to require private parties to pay excessive profits realized during war-

time to the government); *Welch v. Henry*, 305 U.S. 134, 146–51, 59 S.Ct. 121, 83 L.Ed. 87 (1938) (sustaining retroactive Wisconsin statute that taxed shareholder dividends paid two years before statute's enactment); *Funkhouser v. J.B. Preston Co.*, 290 U.S. 163, 167–68, 54 S.Ct. 134, 78 L.Ed. 243 (1933) (upholding retroactive application of statute providing that interest be added to damages awards for breach of contract claims); *Milliken v. United States*, 283 U.S. 15, 21–24, 51 S.Ct. 324, 75 L.Ed. 809 (1931) (upholding retroactive application of federal estate tax statute to tax gifts made prior to enactment of the statute). In *Eastern Enterprises*, both the plurality and Justice Kennedy suggested that liability for health care costs limited to miners formerly employed by the companies could be retroactively imposed, presumably because the companies benefited from their services, and the performance of those services contributed to the health problems.[15] Significantly, other courts of appeals have rejected claims that similar retroactive effects of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.*, ("CERCLA") violate Due Process.

*See United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 734 (8th Cir. 1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Monsanto Co.*, 858 F.2d 160, 174 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 551–52 (6th Cir.2001).[16] And we also have repeatedly rejected Due Process challenges to retroactive federal statutes. *See, e.g., Atlas*, 895 F.2d at 756 (upholding retroactive legislation requiring uranium producers to spend large sums of money to clean up uranium tailings piles).

Not surprisingly, in light of this history, the Supreme Court has repeatedly advised us that such Due Process challenges will only succeed in the rarest of cases. As Justice Kennedy noted in *Eastern Enterprises*, "[s]tatutes may be invalidated on due process grounds only under the most egregious of circumstances." 524 U.S. at 550, 118 S.Ct. 2131.

■ Although such "most egregious circumstances" do not exist *unless* the legislation is severely retroactive, they do not

---

**15.** *See Eastern Enters.*, 524 U.S. at 536, 118 S.Ct. 2131 ("Eastern might be responsible for employment-related health problems of all former employees whether or not the cost was foreseen at the time of employment . . . .") (plurality opinion); *id.* at 549, 118 S.Ct. 2131 (noting that the Supreme Court has "upheld the imposition of liability on former employers based on past employment relationships") (Kennedy, J., concurring); *see also Turner Elkhorn*, 428 U.S. at 18, 96 S.Ct. 2882 ("[T]he imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor . . . .").

**16.** These courts have reasoned that "[c]leaning up inactive and hazardous waste disposal

sites is a legitimate legislative purpose, and Congress acted in a rational manner in imposing liability for the cost of cleaning up such sites upon those parties who created and profited from the sites and upon the chemical industry as a whole." *Northeastern Pharm.*, 810 F.2d at 734. *See also, e.g., O'Neil v. Picillo*, 883 F.2d 176, 183 n. 12 (1st Cir.1989), *cert. denied sub nom. American Cyanamid Co. v. O'Neil*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1506 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *Long Beach Unified Sch. Dist. v. Godwin Cal. Living Trust*, 32 F.3d 1364, 1366 (9th Cir.1994).

exist *merely because* the legislation is severely retroactive and costly, as is the case here. Without attempting to define exactly when retroactive legislation will be held unconstitutional, we perceive that the imposition of even severe retroactive obligations for past acts will be found rational and will be held constitutional under the Due Process Clause if two conditions are satisfied: (1) Congress reasonably concluded that the party subjected to retroactive obligations benefited from activity that contributed to a societal problem, and liability is not disproportionately imposed on that party; and (2) the imposition of retroactive liability would not be contrary to that party's reasonable expectations. It may well be that legislation is constitutional if either of the two conditions is satisfied, but we need not decide that question in this case. Both of those conditions are present.

The first is easily disposed of. Whether or not Edison received the enrichment services below cost from the government, as the government asserts, it certainly benefited from the government's provision of enrichment services. Edison admits that it received a benefit from the government's enrichment services (though it claims to have fully compensated the government

for the benefit).[17] Indeed, Edison could hardly have operated nuclear reactors without the benefit of uranium enrichment services from the United States government or some other approved source.

▇ Congress could reasonably conclude that the processing of the utilities' uranium contributed to a societal problem (processing plant pollution) on two separate theories. First, while the weapons processing may have fully contaminated the buildings at the plants, the utility processing contributed to increased costs associated with decontaminating the grounds around the facilities and disposing of the tails. Second, whether or not the utility processing marginally increased the remediation costs, Congress could reasonably conclude that the later pollution should bear a share of the costs. Edison and utility industry groups themselves contributed to Congress' conclusion that the utilities were responsible by explicitly recognizing in the course of the legislative consideration that it would be fair to impose a share of the remediation costs on the utilities. See *ante* at 1334–36. The Court of Federal Claims does not sit to retry as a factual matter the reasonableness of such congressional judgments.[18]

The remediation costs imposed on Edison and the other domestic utilities also

---

17. *See* Brief for Plaintiff Appellant Commonwealth Edison Co. at 62 ("Although Commonwealth Edison obviously received a 'benefit' when it obtained enrichment services from the government, it paid a price agreed between the parties to represent the fair value of that benefit.").

18. Even if the legislative history here were devoid of support for Congress' conclusions, it would not, of course, be "significant for due process purposes that the legislative history" did not address the issue of causation. *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1256 n. 7 (D.C.Cir.1998). "[T]he government can create a rational explanation *ex post* to support a statute attacked on due

process grounds. That being so, we can hardly require a showing that Congress specifically identified [the] cause of the problem before it passed the [Act] in order to sustain the Act under rational basis review." *Id. See also FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason ... actually motivated the legislature. Thus, the absence of 'legislative facts' ... has no significance in rational-basis analysis. In other words, a legislative choice is not subject

are not severely disproportionate; these utilities are obligated to pay only about a third of the remediation costs, even though evidence was presented that the "production from these plants ha[d] been divided almost evenly between the government and commercial sectors." H.R.Rep. No. 102–474(I), at 144 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953, 1967.[19] In *Pension Benefit,* 475 U.S. at 225–26, 106 S.Ct. 1018, for example, the Supreme Court held that the Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208 ("MPPAA") did not constitute an unconstitutional taking of property under the Takings Clause of the Fifth Amendment because "[t]here is nothing to show that the [retroactive] withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the [MPPAA] is but a necessary consequence of the MPPAA's regulatory scheme." *Id.* The mere fact that foreign utilities are exempted from the assessment also does not mean that the liability imposed on the domestic utilities is severely disproportionate. *See Ass'n of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1255–56 (D.C.Cir.1998); *Holland v. Keenan Trucking Co.,* 102 F.3d 736, 741–42 (4th Cir. 1996).

This conclusion standing alone may be sufficient to warrant rejection of Edison's

Due Process argument. The Supreme Court has held that it is rational for Congress to impose costs for certain activities on "those who have profited from the fruits of" activities that contributed to a societal problem, *Turner Elkhorn,* 428 U.S. at 18, 96 S.Ct. 2882, and that "our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations," *id.* at 16, 96 S.Ct. 2882. However, Edison also has failed to establish that the retroactivity violated the utilities' reasonable expectations. That issue requires more extensive discussion.

## V

One of the key questions in the Supreme Court's retroactivity decisions is whether the regulated party could have reasonably expected that it would be free from the regulatory exaction. Those decisions suggest that if the regulated party could have reasonably expected that it would be subject to regulation, there can be no constitutional Due Process violation. *See, e.g., Concrete Pipe & Prods. of Cal.,* 508 U.S. at 646, 113 S.Ct. 2264.[20] This critical theme was reiterated by each of the separate opinions in *Eastern Enterprises.* There the question was directed to reasonable expectations at the time that Eastern operated coal mines. The plurality concluded that the Coal Act constituted an impermissible

to courtroom factfinding. . . .") (Citations omitted.).

**19.** Amici Sacramento Municipal Utility District and Maine Yankee Atomic Power Company urge that a small portion of the Fund (approximately $75 million) has been used for thorium cleanup for which the utilities were not responsible. Considering that $7.2 billion was authorized for the Fund, *see* 42 U.S.C. § 2297g–1(a), (d), this *de minimus* diversion of funds does not affect our analysis.

**20.** *Cf. Rogers v. Tennessee,* 532 U.S. 451, 121 S.Ct. 1693, 1700–01, 149 L.Ed.2d 697 (2001) (retroactive judicial abolition of archaic common law rule, which precluded murder conviction where victim did not die within year and a day of stabbing, was not unexpected under prior law, and thus did not violate Due Process).

taking because, in part, it "substantially interferes with Eastern's reasonable investment-backed expectations." *Eastern Enters.*, 524 U.S. at 532, 118 S.Ct. 2131. In reaching this conclusion, the plurality emphasized, in part, that Eastern had left the coal mining industry and had ceased to employ miners years before "lifetime medical benefits ... [could] have been viewed as promised" by the industry. *Id.* at 535, 118 S.Ct. 2131.

Justice Kennedy, on Due Process grounds, agreed with the plurality that the three-factor regulatory takings analysis set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), including investment-backed expectations, was relevant to the analysis of the Coal Act's retroactivity. *Eastern Enters*, 524 U.S. at 547, 118 S.Ct. 2131 (Kennedy, J., concurring). He sustained Eastern's challenge to the Coal Act, in part, because the miners' expectations of future health benefits were "created by promises and agreements made long after Eastern left the coal business." *Id.* at 550, 118 S.Ct. 2131.

The dissenters likewise focused on Eastern's reasonable expectations to conclude that "the historical circumstances, taken together, prevent Eastern from showing that the Coal Act's 'reachback' liability provision so frustrates Eastern's reasonable settled expectations as to impose an unconstitutional liability." *Id.* at 559, 118 S.Ct. 2131. Thus, in *Eastern Enterprises* there was remarkable agreement on the reasonable expectations standard, if not its application to the particular case.

In addressing the issue of reasonable expectations here, we must separate the government as sovereign from the government as contracting party. The question, in other words, is not what Edison could

expect the United States as contracting party to do but what it could reasonably expect the United States as sovereign to do. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Nor does the question require an evidentiary trial. Edison's subjective expectations are irrelevant. The question is what a reasonable company in Edison's position should have anticipated.

## VI

The cases suggest three factors relevant to a determination of a party's reasonable expectations. First, was the company operating in a highly regulated industry? Second, did the company know of the problem at the time it engaged in the activity? Third, in the light of the regulatory environment at the time of the activities, could the possibility of the assessments have been reasonably anticipated? We conclude that each of these three factors is present here, and therefore we do not need to decide whether the presence of only one of these factors, without more, suffices to establish a lack of reasonable expectations.

Operation in a Highly Regulated Industry

First, it is undisputed that Edison operates in a highly regulated industry. As has been noted, "the production of energy from nuclear sources is one of the most highly regulated human activities." Peter Riley, *Legal Control of Nuclear Energy Between States*, 21 Cal. W. Int'l L.J. 303, 303 (1991).

We have previously held that participants in this highly regulated field can expect liability for remediation costs. Thus, in *Atlas*, 895 F.2d at 745, we considered the constitutionality of the UMTRCA,

codified at 42 U.S.C. §§ 2022, 2113, 2114, 7901–7942, which required that uranium producers spend large sums of money to clean up uranium tailings piles. We held that the Court of Federal Claims had properly dismissed the complaint for failure to state a claim:

> From the outset of the uranium procurement program, the nuclear industry has been highly regulated, as the plaintiffs admit. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly*, 475 U.S. at 227, 106 S.Ct. 1018, quoting *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958). The only "expectation" that [the processors] could have under the circumstances it has alleged is that it expected it would not have to spend its own money to remediate health and environmental hazards created by its production of uranium. Such an expectation cannot be a reasonable commercial expectation.

*Id.* at 758. This holding was directly supported by the Supreme Court's decision in *Connolly*, in which the Court concluded that the imposition of withdrawal liability from a multiemployer pension plan on certain employers did not interfere with the company's reasonable expectations because, in part, the companies were well aware that "[p]ension plans ... were the objects of legislative concern," and "it was clear" to those companies operating in that highly regulated industry that withdrawal liability could be retroactively imposed. 475 U.S. at 226–27, 106 S.Ct. 1018. We are aware of no case to the contrary.

Edison's Knowledge of the Hazards of the Uranium Processing

Second, it is undisputed that all parties here were aware of the hazardous nature of the materials. In its amended complaint, Edison admitted that the need to decontaminate and decommission the facilities "was an obligation well understood by operators of nuclear facilities throughout the industry." Complaint at ¶ 31. Likewise, counsel for Edison conceded at oral argument here that "[i]t was recognized from way back in the 1950s that there would be decontamination and decommissioning costs" arising from the operation of the uranium processing facilities.

A number of Supreme Court decisions make clear that company knowledge of the dangers present in their operations is relevant to a determination of reasonable expectations. In *Turner Elkhorn*, for example, the Supreme Court noted that the coal mine operators had "been aware of the danger of pneumoconiosis for at least 20 years...." 428 U.S. at 17, 96 S.Ct. 2882. So too in *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992), the Supreme Court ruled that a retroactive 1987 Michigan workers' compensation statute had not "unreasonably interfered with closed transactions" because the employers "knew they were taking a risk in reducing benefits to their workers, but they took their chances with their interpretation of the 1981 law." *Id.* at 191–92, 112 S.Ct. 1105.[21]

The Regulatory Environment

Finally, the regulatory environment is pertinent. We first consider the regulatory environment at the time when Edison

---

21. Other courts of appeals have also rejected challenges to CERCLA's retroactivity because, in part, "it was certainly foreseeable at the time that improper disposal could cause enormous damage to the environment." *Monsanto Co.*, 858 F.2d at 174.

received uranium enrichment services from the government. This focus on the regulatory climate at the time of the processing is supported not only by the Due Process cases discussed above but also by the regulatory takings cases.

■ The *Eastern Enterprises* plurality judged reasonable expectations for purposes of the takings analysis at the time of the relevant activity. *Eastern Enters.*, 524 U.S. at 532, 118 S.Ct. 2131. So too in *Pension Benefit*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166, for example, the Supreme Court rejected the employer's takings claim that money had been taken unconstitutionally because, in part, it found that:

> Pension plans, however, were the objects of legislative concern long before the passage of ERISA in 1974.... Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations.

*Id.* at 226–27, 106 S.Ct. 1018.[22]

■ Where a Due Process violation is alleged because the government has ordered the payment of money, we think that reasonable expectations are to be judged as of the point at which the complaining party entered into the activity

that triggered the obligation—here the submission of uranium for processing. We have no doubt that the utilities were on notice of the possible imposition of remediation liability at the times when the material was submitted for processing.

We first address the period following the enactment in 1980 of CERCLA, when the utilities should have been aware that statutory liability might be extended to cover other hazardous substances.[23]

■ CERCLA is a broad, remedial statute enacted by Congress in order to ensure "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." *Gen. Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285 (2d Cir.1992) (quoting S.Rep. No. 96–848, at 13 (1980)). Under CERCLA, the Environmental Protection Agency ("EPA") is authorized to undertake remedial efforts to clean up hazardous waste spills, and, where an "imminent and substantial endangerment to the public health exists," to take legal action in order to compel potentially responsible parties to undertake their own private cleanup efforts. *Gen. Elec. Co.*, 962 F.2d at 285; 42 U.S.C. § 9606(a).

There are several aspects of CERCLA of immediate relevance here:

---

**22.** Where a regulatory taking of real property is alleged, the state cannot defeat liability simply by showing that the current owner was aware of the regulatory restrictions at the time that the property was purchased. *See Palazzolo v. Rhode Island*, 533 U.S. 606, ——, 121 S.Ct. 2448, 2462, 150 L.Ed.2d 592 (2001). As Justice O'Connor's concurring opinion in *Palazzolo* makes clear, however, even in that context the regulatory environment at the time of the acquisition of the property remains both relevant and important

in judging reasonable expectations. *Id.* at 2465–66.

**23.** CERCLA liability only attached to cleanup costs arising from the remediation of substances defined to be "hazardous substances" under CERCLA and the Environmental Protection Agency's implementing regulations. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4 (listing, *inter alia*, arsenic, lead, mercury and methane as hazardous substances). There is no dispute here that the uranium was a "hazardous substance" under CERCLA.

■ ● "CERCLA is a strict liability statute, one of the purposes of which is to shift the cost of cleaning up environmental harm from the taxpayers to the parties who benefited from the disposal of the wastes that caused the harm." *In re Bell Petroleum Servs.*, 3 F.3d 889, 897 (5th Cir.1993); *see also United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1378 (8th Cir.1989).

● CERCLA by its terms has unlimited retroactivity. Indeed, every court of appeals to consider the question has concluded that Congress intended CERCLA to apply retroactively. *See, e.g., Northeastern Pharm.*, 810 F.2d at 732; *Monsanto*, 858 F.2d at 174.

● While the statute does cap those costs that may be imposed on current and former owners and other potentially responsible parties, those caps are quite high. *See* 42 U.S.C. § 9607(c). For example, the liability for the release of a hazardous substance from a facility is "the total of all costs of response plus $50,000,000 for any damages ...." § 9607(c)(1)(D).

● Costs may be imposed on any current or former property owner or other potentially responsible party. *See Monsanto*, 858 F.2d at 167. Under CERCLA's liability provision, responsible parties include those who arrange for the treatment of hazardous substances. A party may be liable under CERCLA for the arrangement for treatment of any "hazardous substances owned or possessed by [that party] ... at any facility owned or operated by another party or entity and containing such hazardous substances...." *Id.*[24]

■ This type of "arranger liability" may be imposed even if the party who arranges for the treatment of the hazardous substance does not actually perform the treatment. In *Aceto*, 872 F.2d 1373, for example, the Eighth Circuit held, *inter alia*, that the defendants which hired another company to formulate their technical grade pesticides into commercial grade pesticides, would be liable as an arranger under CERCLA if it were established that the defendants owned the technical grade pesticides and the final product and, in addition, knew that the generation of hazardous wastes was inherent in the formulation process. *Id.* at 1381–82.[25]

In other words, by 1980, Edison could have reasonably expected that the enrich-

---

24. Section 9607(a)(3) imposes liability for "all costs of removal or remedial action incurred by the United States Government or a State" on:
> [A]ny person who, *by contract*, agreement, or otherwise *arranged* for disposal or *treatment*, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, *by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ....*
>
> 42 U.S.C. § 9607(a)(3) (Emphases added.).

25. Numerous other courts of appeals have approved the holding in *Aceto*. *See, e.g., Jones–Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 695 (9th Cir.1992).

Edison and the supporting amici unsuccessfully attempt to limit the reach of *Aceto*, based on decisions from other courts of appeals suggesting that that case would not extend to other situations, for example, situations in which the utilities merely arranged for the transportation of hazardous substances, *see United States v. Cello–Foil Products, Inc.*, 100 F.3d 1227, 1232 (6th Cir.1996), and *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993), *cert. denied*, 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994), or the material submitted for processing was not itself hazardous, *see Concrete Sales & Services, Inc., v. Blue Bird Body Co.*, 211 F.3d 1333, 1339 (11th Cir.2000).

ment of its uranium by an independent contractor (the United States) could result in the passage of legislation retroactively imposing liability for a portion of the remediation costs on Edison and the other utilities that benefited from the processing facilities.

Even before the enactment of CERCLA in 1980 liability-imposing regulations were either already in place, or could have been anticipated. CERCLA was not an unheralded statute. Federal statutes enacted in the 1960s and 1970s imposed obligations on the federal government to develop and maintain certain minimum standards for clean air, *see* "Clean Air Act" of 1963, Pub.L. No. 88–206, 77 Stat. 392, codified at 42 U.S.C. §§ 7401–7642, and clean water, *see* Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat. 816, codified as amended at 33 U.S.C. §§ 1251–1376 (the "Clean Water Act" of 1972). In 1970, Congress enacted the National Environmental Policy Act, Pub.L. No. 91–190, 83 Stat. 852 (1970), codified at 42 U.S.C. §§ 4321–4370a, which required all federal agencies, *inter alia*, to conduct thorough assessments of the environmental impacts of all major programs.

By 1969, a number of federal statutes had been enacted or interpreted to impose liability for environmental damages. Section 13 of the Rivers and Harbors Appropriation Act of 1899, 30 Stat. 1152 (codified as amended at 33 U.S.C. § 407), for example, prohibited the discharge of refuse into navigable waters without a permit. In the 1960s, the Supreme Court interpreted that prohibition broadly to impose strict liability on companies for obstruction of waterways caused by the discharge of industrial waste. *See, e.g., United States v. Republic Steel Corp.*, 362 U.S. 482, 491, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); *United States v.*

*Standard Oil Co.*, 384 U.S. 224, 229–30, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966) (construing the Rivers and Harbors Appropriation Act of 1899 to prohibit discharge of oil). Other statutes enacted in the 1970s imposed liability, *inter alia*, for the improper handling, storage and disposal of hazardous wastes. *See, e.g.,* Resource Conservation and Recovery Act of 1976, Pub.L. No. 94–580, 90 Stat. 2795, codified at 42 U.S.C. §§ 6901–6987; Toxic Substances Control Act of 1976, Pub.L. No. 94–469, 90 Stat. 2003, codified as amended at 15 U.S.C. §§ 2601–2629. These statutes clearly telegraphed that environmental regulation was an area of intense federal concern, and that liability could be imposed under federal law.

The possibility of common law liability is also relevant, as the Supreme Court recognized in *Turner Elkhorn*. There, the Supreme Court, in addressing the issue of reasonable expectations, specifically referred to pre-existing state "workmen's compensation principles analogous to those enacted here." *Turner Elkhorn*, 428 U.S. at 15, 96 S.Ct. 2882. So too in *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), the Supreme Court noted the "Court's hesitance to find a taking when the State merely restrains uses of property that are tantamount to public nuisances...." At common law, Edison and other utilities could have potentially been held liable, under the well-established theories of nuisance and strict liability, for environmental damage and other harms resulting from the uranium processing on their behalf. The utilities should have anticipated that such liability could be imposed by the federal government, particularly since the federal government in a number of environmental statutes had taken pains to approvingly preserve common-

law liability, an approval which was extended, for example, by the Supreme Court to common law tort liability for nuclear materials contamination. *See Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).

When discussing the contours and scope of the common law, the Supreme Court has instructed that it is appropriate for us to look to the pertinent Restatement and other secondary sources.[26] The *Restatement of Torts* has long recognized both injunctive and damages liability for nuisance. Nuisances may be public or private. A public nuisance has been defined as "an activity or a physical condition which endangers the health, safety or property of a considerable number of persons...." *See Restatement (First) of Torts*, Intro. to ch. 40, at 217 (1939).[27] A private nuisance has been defined as "an interference with the use and enjoyment of land, and is a wrong only to persons who have property rights or privileges in the land." *Id.* at 219.[28] Numerous courts have recognized nuisance liability for the failure to contain a variety of hazardous

substances in the period before 1969 when the uranium processing began. *See, e.g., Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 238, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (Holmes, J.) (discharge of sulfurous gas); *Exley v. So. Cotton Oil Co.*, 151 F. 101, 102 (C.C.D.Ga.1907) (seepage of chemically polluted water); *Johnson v. City of Fairmont*, 188 Minn. 451, 247 N.W. 572, 573 (1933) (discharge into stream from sewer and factory); *City of Clanton v. Johnson*, 245 Ala. 470, 17 So.2d 669, 671 (Ala.1944) (defective sewer leaking waste); *Carson v. Hercules Powder Co.*, 240 Ark. 887, 402 S.W.2d 640, 641 (1966) (discharge of industrial waste); *City of Syracuse v. Farmers Elevator, Inc.*, 182 Neb. 783, 157 N.W.2d 394, 399 (1968) (discharge of air pollution by anhydrous ammonia facility).[29]

The utilities could not have had reasonable expectations of escaping liability by claiming that they were mere bystanders to the processing by the United States. Section 427B of the *Restatement (Second) of Torts*, published in 1965, made clear that those arranging for processing of hazardous materials could potentially have been

---

**26.** *See, e.g., Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (looking to *Restatement (Second) of Trusts* as source for the common law of trusts); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538, 542, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (looking to *Restatement (Second) of Torts* and *Restatement (Second) of Agency* for guidance in interpreting a federal statute).

**27.** *See also Restatement (Second) of Torts* § 821B (1979), defining public nuisance as "an unreasonable interference with a right common to the general public."

**28.** *See also Restatement (Second) of Torts* § 821D (1979), defining private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land."

**29.** Professor Keeton makes clear, for example, that damage to the environment can constitute a public nuisance:

> Another general type of "public nuisance" is one that is regarded as such because of its impact on the environment, and therefore the use and enjoyment of private property, now and in the future.... The air pollution, the soil pollution, the noise pollution or the water pollution must affect the plaintiff in a substantial way and for that reason constitute a private nuisance. It is not irrelevant that others are affected and that so many others are affected as to constitute a public nuisance. This would mean that the conduct is unreasonable and enjoinable.

W. Page Keeton, *et al., The Law of Torts* 651 (5th ed.1984).

liable under the common law for environmental damages arising from the processing:

> One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve ... the creation of a public or private nuisance, is subject to liability for harm resulting to others from such ... nuisance.

*Id.* at § 427B. *See, e.g., Loe v. Lenhardt,* 227 Or. 242, 362 P.2d 312, 318 (1961) (spraying of chemicals by independent contractor).[30] So too, the utilities could reasonably have anticipated potential strict liability because of the hazardous nature of nuclear fuel. Indeed, at the time that the processing began in 1969, section 519 of the *Restatement (First) of Torts,* published in 1938, recognized strict liability for "ultrahazardous activity," defined as activity that: "(a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of utmost care, and (b) is not a matter of common usage." *Id.* at § 520. By the time the *Restatement (Second) of Torts* was published in 1977, atomic energy was singled out for special attention. Comment g to section 520 of that Restatement, for example, characterized atomic energy as an abnormally dangerous activity, concluding that "[s]ome ac-

tivities, such as the use of atomic energy, necessarily and inevitably involve major risks of harm to others, no matter how or where they are carried on."[31] For all these reasons we conclude that Edison and the other utilities could not have reasonably expected that Congress would not enact legislation imposing remediation costs on the utilities submitting uranium for processing.

The parties have paid little attention to the reasonable expectations of utilities that did not submit uranium for processing but instead purchased enriched uranium from other utilities and then used it in their own reactors. With respect to this material, Congress confronted a choice between assessing the beneficiaries of the processing (that is, the ultimate users of the SWUs) or those utilities that submitted the uranium for processing and then sold it. We conclude that the utilities could have reasonably expected that Congress might impose the assessment on those most directly benefited—that is, the ultimate SWU users.

Despite the existence of these liability risks, Edison appears to argue that the utilities that submitted uranium for processing had no reasonable expectation that liability would be imposed. (On appeal, Edison does not separately address the expectations of the purchasers of already-processed uranium.)

---

**30.** *See also, e.g.,* 7 Stuart M. Speiser, *et al., The American Law of Torts* § 20.16, at 124 (1990) ("[A]s a general rule—all persons who do participate either in the creation or maintenance of a nuisance are liable for injuries suffered therefrom by others."); 58 Am.Jur.2d *Nuisances* § 132, at 772 (1989) ("[A]n employer cannot escape liability by employing an independent contractor to do the work, where a nuisance will result from the performance of such work in the ordinary manner.... Furthermore, it is immaterial in determining liability for nuisance that the employer re-

frains from directing the ... contractor in the execution of the work procured to be done.").

**31.** *See also Restatement (Second) of Torts* § 520 cmt. h, at 39 (1977) ("There is probably no activity, unless it is perhaps the use of atomic energy, from which all risks of harm could not be eliminated by the taking of all conceivable precautions, and the exercise of the utmost care, particularly as to the place where it is carried on.").

First, it urges that, even if the contracts did not bar the imposition of liability, they led Edison to believe that it would escape liability. In other words, Edison claims that it was lulled into believing that no liability would be imposed. This seems to us little more than an effort to reargue the very contention rejected in *Yankee Atomic*—namely, that the special assessments essentially constituted impermissible retroactive price increases to the utility's fixed-price contracts with the government. As we held there, the contracts said nothing about freedom from possible regulation or its monetary consequences. *Yankee Atomic*, 112 F.3d at 1579. Edison and the other utilities are presumed to have been aware that under well-established principles going back more than a century these contracts could not deprive the United States of the authority to regulate in the area, and could not impose contract liability for such regulation absent an unmistakable promise, which we have held did not exist. *See Winstar*, 518 U.S. at 874, 116 S.Ct. 2432; *Jefferson Branch Bank v. Skelly*, 66 U.S. (1 Black) 436, 446, 17 L.Ed. 173 (1861) ("[N]either the right of taxation, nor any other power of sovereignty, will be held ... to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken."). Edison cannot properly rely on the contracts as shielding it from liability. Indeed, we specifically held in *Atlas* that the mere existence of a fixed price in a government contract cannot create expectations that the government will not use its sovereign power to impose additional costs. *Atlas*, 895 F.2d at 754.

Second, Edison also contends that it was led to believe by government officials that the contract price included remediation costs. Significantly, Edison does not allege that those officials represented that regulatory legislation would not be enacted.[32] Even if such promises or representations had been made about subsequent regulatory assessments, those authorities had no authority to bind the government.

Third, Edison complains that the contamination resulted from the government's failure to dispose of the uranium processing byproducts in a manner that would have avoided remediation costs. No such allegation appears in the complaint, and, even if it had, there is no allegation that Edison and the other utilities were reasonably unaware of the government's waste-disposal methods when it submitted the uranium for processing.

Fourth, Edison argues that it could not anticipate liability because title to the (unenriched) uranium passed from the utilities to the government during the time that the uranium was processed at the government-owned plants and back to the utilities only after processing was complete. Edison's argument is essentially that, by temporarily giving up ownership and control of the uranium during processing, those arranging for the processing and receiving uranium after processing should not be liable. We see no basis for the utilities to assume that the technicality of temporary title transfer would necessarily excuse liability that would otherwise exist for those that submitted unenriched uranium for processing and then received enriched uranium

---

**32.** In its amended complaint, Edison alleges in pertinent part that "the Government expressly represented to its customers, and to Congress, that its prices [for the processing services] not only included provisions for [de-contamination and decommissioning] expense, but that [decontamination and decommissioning] costs would also be recovered from future sales." Complaint at ¶ 34.

after the processing.[33]

Fifth, Edison argues that it could not anticipate liability because the facilities were already largely (if not completely) contaminated when the uranium was processed, and because no significant additional cleanup costs were attributable to the pollution caused by utilities' uranium processing.

Both under the common law and CERCLA, shared liability was well known when multiple parties caused a single injury. *Restatement (First) of Torts* § 879 cmt. a, at 446 (1939); *Restatement (Second) of Torts* § 879 cmt. a, at 324 (1979). So too "[m]ost courts have held [that] CERCLA imposes strict liability and joint and several liability." *Aceto*, 872 F.2d at 1377–78 (collecting cases).

However, Edison argues that both under CERCLA and the common law, in a suit between the responsible parties, liability would be allocated between those responsible parties according to their relative contributions to the cleanup costs, relying on cases and other authority such as *United States v. Hercules, Inc.*, 247 F.3d 706, 715 (8th Cir.2001), *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir.1994), and *Restatement (Second) of Torts* § 433A (1965). Edison effectively argues that it could reasonably

have anticipated that it would have had the opportunity to show that the government was 100% responsible.

We do not agree. Under CERCLA and the common law it was notoriously difficult, both as a matter of law and fact, to separate contributions made by particular causes of harm. *See, e.g., Hercules*, 247 F.3d at 717 (observing that under CERCLA "proving divisibility is a very difficult proposition"); *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir.1998) ("Given the nature of hazardous waste disposal, rarely if ever will a [potentially responsible party] be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm [under CERCLA].")[34]; *Restatement (Second) of Torts* § 433A cmt. i ("Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable or practical division."). Under these circumstances the utilities should reasonably have expected that Congress might conclude that Edison and the other utilities did in fact make a major contribution to the cleanup costs and that they should share responsibility. The statute here does not impose all liability on the utilities. They are required to pay less than approximately one-third of the cost, with the remainder being borne by the government. And even this liability may

---

**33.** *See Northeastern Pharm.*, 810 F.2d at 743 (holding that ownership of a hazardous substance is not required for liability under CERCLA to attach); *Hercules*, 247 F.3d at 720–21 (holding that where "the ownership issue [is] debatable," CERCLA liability may exist because courts have " 'not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance.' " (quoting *Aceto*, 872 F.2d at 1381)).

**34.** *See also Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 658 (6th Cir. 2000) (holding that the district court erroneously required the plaintiff to show that each defendant's discharge of hazardous waste was causally linked to an incurrence of response costs and that the correct standard does not include a specific causation requirement, but only that a plaintiff prove that a release of hazardous substances has occurred; that the release caused the plaintiff to incur "necessary costs of response"; and that each defendant is a potentially responsible party).

be passed on to the customers of the utilities to the extent that the utilities' rates are established by traditional rate-making.

In any event, Edison misses the larger point in arguing that CERCLA or the common law would not be construed to impose liability in similar circumstances. The reasonable expectations test does not require that the law existing at the time of processing would impose liability, or that liability would be imposed only with minor changes in then-existing law. The critical question is whether extension of existing law could be foreseen as reasonably possible. Given the broad scope of CERCLA and the common law, we have no doubt that such an extension was easily foreseen, not necessarily as a certainty, but as a reasonable possibility.

In light of Edison's receipt of benefits, the proportionate nature of its liability, and its reasonable expectations, we conclude that its amended complaint failed to state a Due Process claim for which relief may be granted. We also conclude that EPACT is otherwise constitutional.[35]

### CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims dismissing the complaint for failure to state a claim is affirmed. The appeal from the denial of the stay is dismissed as moot.

*AFFIRMED.*

### COSTS

No costs.

MAYER, Chief Judge, with whom Circuit Judges NEWMAN and RADER join, dissenting.

For the reasons set forth in Judge Friedman's opinion in *Maine Yankee*

---

**35.** This case does not raise an equal protection challenge to EPACT. Such a claim was made and is rejected in *Maine Yankee Atomic*

*Atomic Power v. United States,* Nos. 99–5156, –5158, –5160, also issued today, I would reverse the judgment of the Court of Federal Claims to the extent it rejected the due process challenge to the assessment. I also believe the assessment is an illegal exaction. Therefore, I would overrule *Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569 (Fed.Cir.1997), in accordance with my dissent in that case. 112 F.3d at 1582–85.

*Power Co. v. United States,* No. 99–5156, 2001 WL 1472668 (Fed.Cir. Nov.20, 2001), which we decide today.